| 3 | 563 |
| 47 | 241 |
| 47 | 258 |
| 3 | 563 |
| 53 | 63 |
| 53 | 544 |

## WILLIAM H. SLOAN v. JOHN S. MAXWELL and others.

There is no distinction in the degree of mental capacity requisite for the execution of a will of real estate, and that requisite for the execution of a will of personal estate.

To constitute a sound and disposing mind and memory, it is not essential that the mind should be unbroken, unimpaired, unshattered by disease or otherwise. The charge of chief justice Kirkpatrick, in *Den* v. *Johnson*, 2 *South.* 454, commented on.

The standard of testamentary capacity laid down by judge Washington, in *Harrison* v. *Rowan*, 3 *Wash. C. C. R.* 580, and in *Den* v. *Vancleve*, 4 *Wash. C. C. R.* 262, approved and adopted.

The law expects from the subscribing witnesses peculiar care, caution and circumspection.

The mere opinions of witnesses are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant them, in the opinion of the jury. If the reasons are frivolous or inconclusive, the opinions of the witnesses are worth nothing.

Whenever the formal execution of a will is duly proved, he who wishes to impeach it on the ground of incompetency, must support by proof the allegation he makes, and thereby overcome the presumption which the law raises of the sanity of the testator.

THIS cause came before the court upon an appeal from a decree of the orphans' court of the county of Hunterdon, denying probate of an instrument propounded as the last will and testament of John Maxwell, late of the county of Hunterdon. The will was executed in the month of August, eighteen hundred and twenty-five, and the testator died in February, eighteen hundred and twenty-eight, at the age of eighty-eight years. The will was exhibited for probate by William H. Sloan, one of the executors named therein; and a caveat against proving the same was filed by John S. Maxwell and others. On the hearing of

[Sloan v. Maxwell et al.]

the cause in the orphans' court, the judges were equally divided in opinion. Thereupon, by consent of parties, in order that an appeal might be taken, a decree was made on the twelfth day of December, eighteen hundred and twenty-eight, "that the paper writing offered for probate was not the last will and testament of John Maxwell, deceased, and that the same be not admitted to probate, but be set aside, made void, and for nothing holden." The ordinary having been of counsel with one of the parties, chief justice Ewing, and justice Drake, two of the justices of the supreme court, were by virtue of the provisions of the act of the nineteenth of February, eighteen hundred and thirty, (*Harrison*, 297,) called by the ordinary to sit and advise with him on the hearing of the cause. The opinion was delivered by Ewing.

*Saxton*, for appellant.

*Wurts*, for respondent.

Opinion. John Maxwell, of Flemington, in the county of Hunterdon, died in the month of February, eighteen hundred and twenty-eight, at the advanced age of eighty-eight years. During the greater part of his life he had resided in the county of Sussex, where he was distinguished for industry, integrity, usefulness, and consequent respectability. He bore arms for his country in her contest for independence, and afterwards, in common with his copatriots and fellow-citizens, enjoyed and appreciated the rights and privileges won by their wisdom and valor and sufferings. Besides a faithful discharge of the duties of private life, in rearing a numerous family by wise precept and instructive example, his services were incessantly invoked, freely bestowed and eminently useful among his neighbors, and in the county, in various official stations, and especially as a magistrate and judge. Having reached old age, and acquired a competency of this world's goods, he withdrew from the active pursuits of business, removed about the year eighteen hundred and thirteen

to Flemington, and resided there respected and esteemed the remainder of his life. Domestic afflictions there reached him, disturbed at times his peaceful retirement, and diminished in some measure the property he had gathered by his care and toil; enough, however, remained to render him comfortable, and since his decease to form the subject of dissension and controversy among his descendants.

In the month of August, of the year eighteen hundred and twenty-five, he went into one of the stores of the village. No one accompanied him, nor, so far as is known, did any one direct, advise, request or prompt him to go thither, or to execute his ostensible purpose. He found there the proprietor of the store, Samuel D. Stryker, the clerk, Theodore Ellis, and one of the neighbors, Charles Bonnel. He carried in his hand a paper, and said to them, " I have got here a paper which I wish you to sign." One of them observed to him, " I presume it is your will." He answered in the affirmative, and laid it on the counter. His name was already subscribed to it in his own hand-writing, which was familiarly known to the persons who were present. He put his finger on the seal, and acknowledged it to be his hand and seal, and the instrument to be his last will and testament, either in terms, or by affirmative answers to questions put to him by one of the witnesses. The three persons signed their names to the will in his presence. Very little conversation occurred; soon after the attestation, he folded up the paper, and carrying it with him, left the store.

In about two years and six months afterwards, Mr. Maxwell died, and this paper was exhibited in the surrogate's office for probate as his last will and testament. A caveat having been filed, the matter was brought before the orphans' court, where, after hearing the examinations of many witnesses, the judges were equally divided in opinion ; and by consent of the parties, in order that an appeal might be taken, a decree was made on the twelfth day of December, eighteen hundred and twenty-eight, " that the paper writing offered for probate was not the last will and testament of John Maxwell, deceased, and that the same

[Sloan v. Maxwell et al.]

be not admitted to probate, but be set aside, made void, and for nothing holden."

An appeal was accordingly taken. His excellency the governor and ordinary, having been of counsel for one of the parties, the appeal, and the evidence, and the arguments of the counsel, have been heard before the subscribers, two of the justices of the supreme court, called to this duty by the ordinary, in pursuance of the statute. And we are now to recommend to him the decree which in our opinion ought to be made, and to communicate to him the reasons on which our recommendation is founded.

The mental capacity of the decedent is the line of strife between the parties. When the question of competency or incompetency to execute this interesting and important function is settled, there is no farther ground of controversy. The formality of the execution of this instrument as a will of personal estate, is abundantly and conclusively shown, and has not been made the subject of discussion. As a will of personal estate it has been offered for probate. The probate of it as such, is alone the extent of the jurisdiction of this court, or, perhaps more correctly speaking, of the conclusive jurisdiction of this court; for, whether sustained or repudiated here, it may, notwithstanding, as an instrument for the conveyance of lands, or in other words, as a will of real estate, be the subject of inquiry, and may be decreed valid or invalid in another tribunal. We may at once, therefore, disclaim any intention to examine the conformity of the execution of this instrument to the formalities requisite to constitute a will of real estate. The great question involved here is common to the instrument, whatever may be the description of property which it affects. There is no difference or distinction of which we are aware, in the degree of mental capacity resulting from the different kinds of property. The rule as to personal and real estate is the same. In 6 *Co. Rep.* 24, it is said, " If he were of sane memory at the time of making the testament of the goods, he could not be of non-sane memory at the time of the making of the will of the lands, both being made at one and the same instant."

Our first duty, then, in the progress of this inquiry, and be-fore we open the evidence of this particular case, is to fix, so far as we may be able, the standard of capacity. Who is competent? What degree of capacity is requisite and sufficient to make a valid will? An answer, in general terms, is easily found; but to furnish an answer specific, practical, and readily to be applied to any given case, is an arduous task, and has frequently em-barrassed the highest sagacity and discernment. When we are told, in the language of our statute, that he who is "of non-sane mind and memory" cannot make a will, or what is the same idea, the one being an affirmative and the other a negative mode of expression, that he who makes a will should be "of sound and disposing mind and memory," we have gained very little practical instruction or information. For the question immedi-ately recurs, What is a sound mind? What is a disposing me-mory? What state or what degree of either is thereby contem-plated and expressed?

The exposition by Godolphin sheds but faint light. "To be of sound and perfect memory," says he, "is to have a reasonable memory and understanding to dispose of an estate with reason :" *Godolphin, Orp. Leg.* 25. The instance he puts, after stating the rule that "old age alone doth never deprive a man of the power of making his testament," is rather intended as an exam-ple of positive incapacity, than to give a general test for the so-lution of this important inquiry. "When a man, by reason of extreme old age, is become even a child again in his understan-ding, or rather in the want thereof, or by reason of extreme old age or other infirmity is become so forgetful that he knoweth not his own name, he is then no more fit to make a testament than is a natural fool :" *Godolph.* 26.

The light is somewhat, though not satisfactorily or sufficiently increased, by the *Marquis of Winchester's* case, 6 *Co.* 23 : "It is not sufficient that the testator be of memory, when he makes the will, to answer familiar and usual questions, but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason ; and that

is such a memory which the law calls sane and perfect memory."
Now if the meaning here is, that the disposition of the testator's
property by the will should be conformable to what the witness
who is to testify of his capacity, or the judge who is to decide
on it, may deem reasonable and discreet, there is nothing more
untrue; for if the capacity of the testator is admitted or estab-
lished, the disposition he may have made must prevail, however
indiscreet and unreasonable it may be; as if he should give all
from meritorious children to an utter stranger. *Stat pro ratione*
*voluntas.* And if the meaning is, that in a doubtful case the
disposition may be scrutinized, there are few things more unsafe,
since the testator may have most satisfactory motives and rea-
sons, of which others are uninformed, to withhold or guide his
bounty. But if the meaning is, that he must possess under-
standing and reason in order to make a valid disposition, we are
brought back almost to the starting post; for, although we are
told it is not enough to be able to answer familiar questions, we
are still left to ask, What is a competent degree of understanding
and reason ?

The exposition which was read and urged upon us at the ar-
gument, from *Den* v. *Johnson,* 2 *South.* 454, is not satisfactory.
" Sound signifies whole, unbroken, unimpaired, unshattered by
disease or otherwise." If so, a will can only be made in the
spring, or at the latest in the summer, and never in the autumn
of life. Nor, indeed, does this passage, taken by itself, and
without the explanations and qualifications contained in the
charge of which it formed a part, properly convey the meaning
of the judge who used it. For he says, " It is true that every
discomposure of mind by these causes," (melancholy, grief, sor-
row, misfortune, sickness or disease,) "will not render one inca-
pable of making a will ; it must be such a discomposure, such a
derangement, as deprives him of the rational faculties common
to man." And again he says, " If, upon the whole, the jury
should be of opinion that the mental powers of the testator were
*so far* enfeebled and broken as that she could not make a dis-
creet disposition of her affairs herself, and that the will in ques-

tion was devised by other persons, and only assented to by her, upon being asked, without the power of understanding it, then they ought to find" against the will. And again: "A disposing mind and memory, is a mind and memory which have the capacity of recollecting, discerning and feeling, the relations, connections and obligations of family and blood."

From the opinions delivered by the other judges in their review of the charge, it is obvious they do not sanction or approve the unqualified exposition of the term "sound." One of them said, "The charge was substantially consistent with the law." The other said, its correctness was to be determined by the whole taken together; and that so taken, the definition of testamentary capacity was true; though it should be admitted, in describing the force of the word sound by itself, too strong language had been used.

The remarks of the same learned judge by whom the charge was given, made in the subsequent case of *Den* v. *Vancleve*, 2 *South.* 660, show that the strict construction was not designed by him. "By these terms," (a sound and disposing mind and memory) says he, "it has not been understood that a testator must possess these qualities of the mind in the highest degree, otherwise very few could make testaments at all; neither has it been understood that he must possess them in as great a degree as he may have formerly done, for even this would disable most men in the decline of life; the mind may have been in some degree debilitated, the memory may have become in some degree enfeebled, and yet there may be enough left clearly to discern and discreetly to judge of all those things and all those circumstances which enter into the nature of a rational, fair and just testament. But if they have so far failed as that these cannot be discerned and judged of, then he cannot be said to be of sound and disposing mind and memory."

Another of the court in that case said, "I could by no means concur with the chief justice in his exposition of the term sound, as applied to the mind of the testator—"whole, unbroken, unchanged by disease, age or infirmity." Few indeed would be the wills

72

confirmed, if this is correct. Pain, sickness, debility of body from age or infirmity, would, according to its violence or duration, in a greater or less degree break in upon, weaken or derange the mind, and render it incapable of exercising its full powers, as in time of perfect health. Yet I believe that none have ventured to pronounce that extreme illness incapacitates a testator, or that old age, when memory was impaired and judgment weakened, rendered him incapable of disposing of his property. 'Of sound and disposing mind and memory,' is the language used. The sentence must be taken together, not disjointed, and sound explained in its literal, distinct and separate meaning, unconnected with the subject matter to which it necessarily and evidently refers. Thus taken in connection, it means that the testator, at the time of executing his will, had that soundness of mind and memory enabling him to understand the nature of the instrument he signed and sealed, the relative situation of his family and connexions, the general extent of the property disposed of, and that it was so disposed of as was agreeable to his desire."

Another of the court said, "The execution of a will, the distribution of an estate among a family, is an act of a peculiar character. It is not the prompt and unpremeditated effort of the moment, but the tardy effect of long observation on his family and property, on the claims of duty and the calls of affection. It is frequently the result of the combined reasoning and feelings of years, often meditated on, often resolved, and not unfrequently divulged."

The subject of testamentary capacity was investigated, examined and discussed, with great assiduity, in the cases of *Harrison* v. *Rowan*, and *Den* v. *Vancleve*, in the circuit court of the United States for this district; and the legal doctrines on this topic were stated and explained with great perspicuity and precision by that eminent judge who for many years presided there, and who administered justice so beneficially to the public, and with an ability and reputation rarely surpassed and never to be forgotten.

In the former case, in his charge to the jury, he said, "As to

the testator's capacity, he must, in the language of the law, have a sound and disposing mind and memory. In other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who are the objects of his bounty, and the manner in which it is to be distributed between them. It is not necessary that he should view his will with the eye of a lawyer, and comprehend its provisions in their legal form. It is sufficient if he has such a mind and memory as will enable him to understand the elements of which it is composed, the disposition of his property in its simple forms. In deciding upon the capacity of the testator to make his will, it is the soundness of the mind, and not the particular state of the bodily health, that is to be attended to; the latter may be in a state of extreme imbecility, and yet he may possess sufficient understanding to direct how his property shall be disposed of; his capacity may be perfect to dispose of his property by will, and yet very inadequate to the management of other business, as, for instance, to make contracts for the purchase or sale of property. For most men, at different periods of their lives, have meditated upon the subject of the disposition of their property by will, and when called upon to have their intentions committed to writing, they find much less difficulty in declaring their intentions than they would in comprehending business in some measure new."

In the subsequent case of *Den* v. *Vancleve*, judge Washington spoke thus: "He (the testator) must, in the language of the law, be possessed of sound and disposing mind and memory. He must have memory: a man in whom this faculty is totally extinguished, cannot be said to possess understanding to any degree whatever, or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able at all times to recollect the names, the persons or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered, and yet his under-

standing may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much What was the degree of memory possessed by the testator? as this: Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, Were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged, at the time he executed his will?"

Without seeking further to pursue this fruitful subject in the multitude of cases to be found in the English and American books, and without undertaking to give an exposition in language of our own, we shall on the present occasion adopt in substance the doctrine laid down by judge Washington, as the proper exposition of the terms sound and disposing mind and memory, and the correct standard of testamentary competency and capacity. We find it perspicuous, we believe it sound, and we learn it was received and approved by the ordinary in the recent case of the appeal on the will of *Tace Wallace ;** and on this last consideration we much rely, because we have the aid of his deliberation and judgment; and, sitting on the present occasion in his place, we have the satisfaction to know that the claims of the parties before us will be estimated by the same standard as if he had decided upon them.

We now proceed to compare the mind and memory of John Maxwell, as displayed in the evidence before us, with the standard which has been assumed. The point of time at which the

---

* It is a matter of regret that the opinion in this case, delivered by Vroom, ordinary, at January term, 1831, cannot be procured for publication. The opinion was loaned by the ordinary, and cannot now be found.

testator's competency is to be tested, is that of the execution of the will; his antecedent or subsequent condition is chiefly important as it may bear on that epoch. And we naturally resort, in the first place, to the subscribing witnesses; because they have seen him at the decisive period, and because the law expects from them peculiar care, caution and circumspection; presuming from the fact of the attestation, that they believed him competent, as otherwise they ought not to have given countenance to a deceptive instrument.

The first of them examined was Samuel D. Stryker: he relates the circumstances which attended the execution of the will. He says, "He thinks the testator was capable up to the time of the execution of the will of transacting some kinds of business, but not business generally; he was capable of taking care of his interests as to money matters." "He thinks that as to money matters the testator was rather a smart man for one of his age. The strength of his mind seemed to rest upon his money matters. Deponent thinks that, taking into consideration the inclination of his mind to pecuniary matters, that the will had been made nearly three years before his death and the probability that the testator had access to it and that he might have altered it if any thing was wrong, that he was capable at the time of the execution of the will of making a will; at the same time, however, he wishes it to be understood that he is not clear upon this point, he feels some doubts about it. Deponent would rather say that he was capable, for he thinks the strength of his mind ran upon his property." Deponent says that the testator's "memory was not good at the time of the execution of the will, nor was it very good when the deponent first knew him," which it may be observed was in the year eighteen hundred and twenty, and in the intermediate time repeated transactions of business had occurred between them, chiefly in the negotiation of loans of money for other persons, and in the loan and repayment of money by the witness himself, and in the frequent dealings of the testator at the store of the witness. "Deponent thinks that the testator was capable of making a will at the time this one

was executed, and of disposing of property to the amount of twenty or thirty thousand dollars in a rational way, at the same time, however, he has some doubts about the matter.    There are different degrees of capacity, but from all the facts and circumstances of his general knowledge of the testator, he thinks that he was capable of making a will, but at the same time he has some doubts upon the subject."  "Deponent says, that if he had wanted to treat with the testator for the purchase of a house and lot of which the testator was the owner, that he should have gone to him.   He thinks that he was capable of making a contract and conveyance of his property ; that he could not have been overreached, that he understood himself and his property too well.   Deponent says he cannot answer the question whether he could have been overreached in making his will."

This witness was intimately acquainted with the testator, having for several years before the execution of the will lived in an adjoining house, and passing the testator's dwelling incessantly to his store.   His doubts evidently result from an erroneous conception of the capacity requisite to make a will.   He had fixed in his own mind too elevated a standard.   If he had known that the capacity may be "very inadequate to the management of other business, as, for instance, to make contracts for the sale or purchase of property," and yet he may be "perfect to dispose of property by will ;" if he had known that a man " may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will," we cannot hesitate to see that his doubt would be dispelled ; he would have deemed him competent to make a will, as he thought him "capable of making a contract and conveyance of his property;" and for the same valid reason : " he understood himself and his property too well to be overreached."

This witness relates very few important facts bearing upon the question of capacity ; all, however, that he does state are of competency, none of incompetency.   Every thing that was said or done by the testator at the execution of the will, was rational,

appropriate, and in proper time and place. Both before and af-
ter the execution of the will, he was in the habit of coming to
the store frequently and purchasing such articles as he wanted,
for which he always paid either immediately or at some short
time after.   When he did not pay the cash he would generally
remember it and come in a day or two and pay; sometimes,
however, he appeared to forget the purchase, and on being re-
minded by the witness or his clerk, he would always recollect
and pay the money.   Both before and after the execution of the
will, he was in the habit of calling at the store of the witness to
have his interest calculated and to have moneys overlooked which
he had received.   Some short time before the will, the witness
paid the testator some silver money, which was counted by him.

   Theodore Ellis was the next of the subscribing witnesses exam-
ined.   He went to Flemington in the spring of the year eighteen
hundred and twenty-one, left there in eighteen hundred and
twenty-four, and after an absence of eleven months returned
about a month before the will was executed.   While there he
was a clerk in the store of Mr. Stryker, and living near the tes-
tator, had very frequent intercourse with him.   He spoke of the
transaction of business with the testator, in dealing at the store,
and in making calculations for him, and of having heard him
talk of his property, and of his desire to make sale of some of
his real estate before the absence of the witness from Fleming-
ton.   " From my observation," says he, " in the dealings I had
with him, he appeared to understand his own interest; whether
he was perfect in all his business I can't say, but from what I
have heard him say I should suppose he was."   After the return
of the witness he was not enough acquainted with the testator,
he said, to judge whether he was capable of conveying his pro-
perty by will.   He was better able to judge of his capacity ele-
ven months before, than at the time he witnessed the will; but
he knew no circumstance to induce him to believe the testator
was not competent at that time.   Some time before he left Flem-
ington, he heard the testator speak of a house and lot in the vil-
lage, he had sold to one Large, and had taken back or was about

to take back, from the inability of the latter to pay for it. He thought if the testator had then wanted to make sale of the swamp lot, or the lot in town, he was of competent mind to fix his price and make a transfer and take care of his interest, and he knew not but the testator was competent to have made sale and conveyance of all his real property. After the witness returned to Flemington, which it will be remembered was near the time of the will, he called on the testator, and did not discover any very material difference in him. The testator recognised him, and complained of being unwell.

The witness speaks very sufficiently of the capacity of the testator prior to his absence from Flemington; and although he did not, as he says, see enough of the testator after his return to enable him to speak with certainty as to his competency, yet he neither saw or knew any thing to bring it into doubt, and especially he discovered no material difference in him, which, if it had occurred, would have been apparent to a person who had been absent for months, although it might not have been so perceptible to another who had been in the habit of daily intercourse.

The other subscribing witness is Charles Bonnel. He relates the circumstances of the execution of the will in nearly the same manner as the other witnesses. On the score of capacity, he says, "At the time of the execution of the will, I could not and should not say that the testator was of sound and disposing mind and memory: this was my impression at the time of the execution of the paper." And again: "At the time of the execution of the will, I did not consider the testator of sufficient capacity to make a wise and rational distribution of his property among his connections and family, under the proper obligations and considerations of blood." And yet with these views of the testator, he did not hesitate to attest the will, and under the impression also, as he declares, that the testator at the time knew what he was about, and that the instrument was his will.

From the opinion thus positively expressed by the witness, and from the proximity of his residence to the testator, rendering

their intercourse very frequent and almost daily, we may naturally expect to hear from him the facts on which his opinion was founded clearly and fully detailed, and to have some striking marks of his incompetency exhibited, from which others as well as the witness will be brought to a like conclusion. But a review of his testimony disappoints this reasonable expectation. The weight of an opinion, without reasons to support it, was laid down by judge Washington, in one of the cases already referred to, very correctly, and in conformity with the steady current of authority from the time of Godolphin and Swinburne, in the following words: "The mere opinions of witnesses are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant them in the opinion of the jury. If the reasons are frivolous or inconclusive, the opinions of the witnesses are worth nothing."

Indeed there is even some incongruity in the opinions entertained by this witness; for the question being put to him whether he supposed the testator was at the time capable of managing his estate discreetly and with prudence; he answered, somewhat evasively, "If persons had paid him money, I believe he would have held fast to it and kept it until some person put it out for him." And again: "At the time of making the will, or thereabouts, the old man had sense enough not to trust himself to make a bargain. By this, I mean to say, he had sense enough to know he was not capable of making a bargain or of transacting his business." Now, to take care of money until properly replaced, does not savor of incapacity; and self-confidence is a more usual concomitant of incompetency, especially in old age, than self-distrust.

Mr. Bonnel says he thinks the memory of the testator would not have served him to make a bargain which would have taken ten minutes, but he states no fact and gives no instance of an attempt and failure; here is, then, only an uncorroborated conjecture.

He had "frequently seen the testator in the street inquiring for people whom he said he wanted to see, and was going in a

wrong direction to find them." And who of the wisest among us has not been in a like predicament? But as the witness says this may have been after the will was executed, we need say no more of it.

Mr. Bonnel gave as an instance of the failure of the memory of the testator, that he used to forget his grand-children, which had occurred both before and after the making of the will. He thought he had seen several instances, perhaps a dozen, of his forgetfulness of his grand-children and others. He was able, however, to call to his recollection but one in regard to his grand-daughter, Ann Sherrard, who with most of his grand-children then resided in the county of Sussex, and visited him, the witness said, once or twice a year. At one time, on the day of her arrival as he presumed, for she had then her bonnet on, she met the testator near the store, and having inquired after his health, he said, Why, who are you? She told him, and they went into his house together. For the sake of brevity and connexion, some facts of this kind will be noticed in the sequel.

The only other fact stated by Mr. Bonnel, which as it is stated at large by him, and seems therefore to have had some influence on his opinion, and as it occurred within a very short time after the will was made, on the same day, we will examine somewhat in detail. After the testator had gone from the store with the will, and been absent ten or fifteen minutes, he returned, bringing with him a bond and mortgage, and requested Mr. Stryker to calculate the interest. When done, Mr. Maxwell abated fifty dollars of the amount, and the balance was paid to him by the obligor, Peter I. Case. The witness considered the money safe, and thinking the testator ought not to have made the discount, asked him why he would throw so much away. He answered, he had promised the man to do so for the sake of getting the money.

Some farther facts in relation to this transaction were stated by the obligor on his examination. He was a weaver by trade, had some personal estate, but no other real estate than that included in the mortgage, which was not worth the amount due

on the bond, then three hundred dollars, with the interest for nearly one year. The testator called on him for payment, and was told he would have to take the land. After some conversation he agreed to relinquish fifty dollars for the sake of payment. In a few days, Case called on him and asked him if he would do as he had said, without mentioning the sum. The testator remarked that he could not, it was too much. Case then told him he would have to take the land, and got up and walked towards the door. The testator desired him to stop, he would allow the fifty dollars; and procured the bond and mortgage, and they went together to the store of Mr. Stryker.

On this transaction it may be remarked, that we see the testator, on the very day the will was made, managing, directing and controling his own affairs; and to guide us in judging whether it was discreet to relinquish so large a sum, we are to recollect, that when he withdrew from business he had converted his landed estate into personalty, for more convenient management; that he had recently been compelled, at very considerable loss, to take a farm, and a house and lot in the village, which had been mortgaged to him; and that the land held by Case was unequal to the amount of the debt charged upon it. If, too, he then wanted money badly, as he told Mr. Bonnel, his conduct does not appear unreasonable. The conclusion forces itself on our minds, that no one of those who were apprised of the transaction regarded him as an imbecile, childish old man, incapable of managing his affairs. Even if interest would have led Mr. Case, which there seems no ground to suspect, to take advantage of his infirmities, can we believe that Mr. Bonnel and Mr. Stryker would not have cautioned him against the glaring impropriety of treating with a man whose mind and memory were not sound? Would they not have protected their neighbor and friend from imposition? Would they have become accomplices in the fraud, by suffering it to be perpetrated in their presence, without objection or rebuke? Persuaded as we are, they both were honest and honorable and independent men, we can account for their conduct only by the conviction, that they believed

him capable of managing his concerns, and disposing of his property, and felt that, even if he yielded more than they would have done under like circumstances, they were not at liberty to interfere.

These are all the facts stated by Mr. Bonnel, which can serve as grounds for the opinion as expressed, of the incapacity of the testator, and which, in our judgment, they do by no means serve to sustain. And we cannot omit again to advert to the inconsistency which forces itself upon us, between the opinion he expressed on his examination, and the certificate he gave by attesting the will, as every attesting witness does give, that he then believed the testator competent to make it.

We have thus reviewed the testimony of the subscribing witnesses ; and the result on our minds is, that the weight of evidence, as well from the opinions of these witnesses, as from the facts they state, is decidedly in favor of the capacity of the testator at the execution of the will.

We now proceed to the other witnesses. And we propose, in the first place, to look into the evidence produced on the part of the caveators; for on them rests the burthen of proving the incompetency of the testator. The truth of this position we heard called into question on the argument with some surprise, for we had supposed it to have been so long, so firmly and so universally settled as to have assumed the character of an axiom, or element, or fixed principle, that whenever the formal execution of a will is duly proved, he who wishes to impeach it on the ground of incompetency, must support by proof the allegation he makes, and thereby overcome the presumption which the law raises of the sanity of the testator.

Let us, however, pause a moment to examine this point. In the case of *Den* v. *Johnson*, in the supreme court, the doctrine is laid down in these words : "After probate, the sanity of the testator was always to be presumed in favor of the will—the insanity always to be proved by him that alleges it." By the words " after probate," we are, we suppose, to understand, after proof of the formal execution. In *Den* v. *Vancleve*, judge

Washington laid down the rule in broader terms: "The presumption of law always is in favor of sanity at the time the will was executed, and the burden of proof lies upon the person who asserts unsoundness of mind." In that case the will in question had not been exhibited in the orphans' court. In *Harrison* v. *Rowan*, 3 *Wash.* 584, judge Washington charged the jury that "the question was whether John Sinnickson made a valid will of his real estate; that the plaintiff held the affirmative; and that all he had to do was to satisfy them that the will was executed in due form." In this case the will had actually been repudiated in the orphans' court. In delivering the opinion of the supreme court of New-York, in *Jackson* v. *Vandusen*, 5 *John*. 158, judge Vanness says, In all cases where the act of a party is sought to be avoided on the ground of his mental imbecility, the proof of the fact lies upon him who alleges it, and until the contrary appears, sanity is to be presumed. He says not only that this is the rule, but that independently of authority, it ought to be so, and that it is recognized in all the elementary writers and in all the adjudged cases he had met with both in law and equity. To the numerous authorities he quotes may be added a train of cases to the same effect in the American courts. We forbear to enlarge. The objection, although unsound, could not be passed without respectful attention.

The advanced age of the testator, upwards of eighty years, was made on the argument a distinct point against the will, not indeed as rendering him legally incapable, so much as raising a presumption of incompetency. The power of making a valid will is not impaired by the access of old age, nor is it denied to him who has attained the utmost verge of human life, on that account alone. Three-score years and ten do not always, or necessarily, extinguish the light of intellect. It is then, in some men, more brilliant than it is in others at a much earlier age. The power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect, when other motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted and despised.

Chancellor Kent sustained the will of a man between ninety and a hundred years. He properly said, " The law looks only to the competency of the understanding, and neither age, nor sickness, nor extreme distress or debility of body, will affect the capacity to make a will, if sufficient intelligence remains ;" and he cited with approbation the commentary of Voet on the Pandects. *Licet enim non sani tantum, sed et in agone mortis positi, seminece ac balbutiente lingua voluntatem promentes, recta testamenta condant, si modo mente adhuc valeant.* 5 *John. Chan. R.* 158.

The first witness examined on the part of the caveators, was Dr. Stewart Kennedy, a grand-son of the sister of the testator. The fact he states is, that on one occasion, in the spring of the year eighteen hundred and twenty-three, he was not recognized by the testator, and the latter mistook the connection between them. " I called on him," says the witness, " at his house, spoke to him, and he did not know me. Mrs. Maxwell knew me, and told him who I was; he then appeared pleased to see me." After a little while the testator introduced the witness to a gentleman as Dr. Kennedy, his grand-son. Mrs. Maxwell said, not his grand-son, but his sister's grand-son. He sat a little, as if thinking, and said, well, maybe it is so.

The whole circumstance was neither unusual among elderly people, nor remarkable. The witness was, as he says, quite a boy when the testator removed from the vicinity of his father's residence in Warren, and had grown up to manhood, seeing the testator but once or twice a year. He had seen him but once in the year before. The other occurrences of the visit seem to us greatly to outweigh the mistake, and should, we think, have removed from the mind of the witness all unfavorable impressions. Mr. Maxwell not only manifested his gratification at seeing him, but inquired after his father and mother and other friends in Warren ; and his inquiries and questions relative to the family and his friends were, as the witness says, pertinent and correct. Was not here mind, memory, an attention to the courtesies of life and to the duties of kindred and affection ?

William Kennedy, esquire, was the nephew of the testator, and intimately acquainted with him until his removal to Flemington; after which he saw the testator once or twice a year, mostly when he made visits to Easton, where Mr. Kennedy for some time resided. He considered that he could discover for some years a falling off in the testator's recollection, very much. He had not had much business with him in that time, but thought he could discover a failing in his recollection and mind, in his recollection very much. He speaks of but one transaction of business in which he saw the testator engaged, either with himself or others. In the year eighteen hundred and twenty-one or eighteen hundred and twenty-two, the testator placed a bond in his hands for collection at Easton. After it was collected, the testator visited him, received the money, and signed a receipt in his docket. In settling it with the testator, he says he was rather induced to believe that he was not capable of making calculations. For what reason, he does not state. He made no attempt and failure. The witness gave him "a statement of the times of payment, and of the amount, in order that he might show it to his family," and he did so "because he did not think him capable of entering into long calculations about money and property." But not a single fact is stated by the witness whereby the capacity of the testator was tested. The witness thought he did not attempt to examine the account, and this is by no means an unusual occurrence, as experience will bring to the recollection of every one accustomed to business. The testator reposed confidence, as he had good reason to do, in the integrity and accuracy of Mr. Kennedy, and he did not, therefore, revise the statement, at least not in his presence. The truth, however, stands uncontroverted, that the testator in this instance actually did transact his own business, and no fact is related bringing into doubt his capacity to do so.

Another occurrence is related by this witness. In the year eighteen hundred and twenty-two or eighteen hundred and twenty-three, the testator visited him in Easton, and, so far as we are informed, unaccompanied by any of his family. He expressed

a wish to call on an old acquaintance residing in the town, whither the witness went with him, and there left him, having obtained his promise to return, and being told, in answer to an inquiry whether he could find the way back, that he knew every part of the town before the witness was born. Not returning as soon as the meal occurred of which he was to partake, Mr. Kennedy went in search, and found him coming from towards the Lehigh bridge, whither, crossing the main street he had gone in a southerly instead of an easterly course to the residence of the witness. "Where, uncle, have you been," said he. "Really," replied Mr. Maxwell, "I was lost." And in all this we perceive no extraordinary transaction. There was a mistake. He may have gone wrong from inattention, or there may have been a failure of memory; and had he been found wandering and persisting in error, a more unfavorable inference might have been just. But he had himself discovered his error, and was actually retracing his steps.

On the score of opinion, Mr. Kennedy says, he should have been sorry to see him, at that time, undertake to make a bargain; yet he adds, "I do not say that he was not fit to make a bargain; he might have made a bargain careful and close enough for any thing that I know." Farther, he says, "I am not able at present to recollect of any particular expression or sentiment that would lead me to believe that he had lost his mind, although my impression was that his mind had failed. Speaking of ancient things, his memory appeared to be good, and of recent transactions, his memory appeared to be wavering. In speaking of the revolutionary war, and things that transpired then, I think his memory was better than mine." "In all the conversations I had with him, he appeared to be sensible of his obligations to his kindred by ties of blood."

Dr. John Manners had been acquainted with the testator for about fifteen years, and thought he could discover a gradual declension of his mental and bodily powers. For several years before his death he did not consider him capable of transacting business of any considerable importance. In the month of Au-

[Sloan v. Maxwell et al.]

gust, eighteen hundred and twenty-five, from the impressions he had of the testator, he should not think he had capacity sufficient to dispose by will of a large property with discretion and proper regard to the interests of his own family; yet he says, " I can't say whether he was competent at that time to make a sale and transfer of land or not: he might. I don't think he was capable of making a transfer of all his property by will or deed; a simple sale I think he might probably have been capable of making, but I do not think him capable of transacting business that required any very complicated operation." Moreover, the doctor says in express terms, " I can give no specific instance of mental imbecility," and that he thought he had capacity enough to feel the force of natural affection towards those of his family about him. He recollected no foolish or childish expression of the testator, nor any one particular expression or sentiment uttered by him, showing at any time a want of mind, nor did he recollect, in his intercourse with the testator, any act of that character, except his forgetting the witness might be one. The latter, indeed, is the only matter of fact on the subject of capacity related by the witness. " In one instance, in particular, I recollect he did not know me." The circumstances are not detailed, wherefrom we might have better appreciated its weight; nor the time; but it was doubtless after he removed from Flemington, when, although he called on the testator once or twice, he had not frequent opportunities to see him. And such a casual want of recognition, by a very aged man, of a person whom he seldom saw, and with whom, as the witness himself says, he was not very intimately acquainted, more especially when we bear in mind that the eye-sight of the testator was then in some degree impaired, is very far from being a decisive proof of mental imbecility.

An habitual inability to recognize his neighbors and acquaintances, would be strong evidence of a sunken intellect; but a few occasional instances of this kind, may show in an old man a memory weakened, but not destroyed—impaired, but not extinguished. " The failure of memory," says chancellor Kent, " is

74

not sufficient, unless it be quite total, or extend to his immediate family and property. The want of recollection of names, is one of the earliest symptoms of a decay of the memory; but this failure may exist to a very great degree, and yet the solid power of understanding remain."

In the case of *Vancleve's will*, some strong facts of this kind were proved on the trial, in the circuit court of the United States. He would ask foolish questions, and inquire the names of his former acquaintances who called to see him. Upon one occasion he inquired how a particular acquaintance was, and being answered that he was dead, he not long afterwards expressed a wish to see him. At one time he mistook one of his nieces for a grand-daughter who had long before been dead. Many similar instances of a great decay in his memory were stated; yet the verdict of the jury in this case, which sustained the will, was satisfactory to the court.

Samuel Griggs was a neighbor of the testator, and had known him for fifteen years. He thought he had not mind and capacity enough to make a will in the year eighteen hundred and twenty-five. " My opinion," says the witness, " is founded upon his forgetfulness in dealings I had with him, and in counting money. He could not count thirty dollars before he would get bewildered." And he stated all the instances of forgetfulness and incapacity he recollected.

The witness was indebted to the testator in a bond of two thousand dollars, on which for a number of years he paid the interest. In eighteen hundred and twenty-three he paid one hundred and forty dollars. The testator could not count it. His wife took it and counted it for him. The testator said his mind was all gone, and could not do any thing any more. In eighteen hundred and twenty-four he paid him the like sum. The testator started then to count it, but could not, and his wife had to count it for him. Yet we find here the testator engaged in the transaction of business, and moreover, on these occasions he actually wrote receipts for these moneys on the bond which he held against Mr. Griggs.

[Sloan v. Maxwell et al.].

The following is one of the instances of forgetfulness. In May, eighteen hundred and twenty-five, the testator sent five hundred dollars by the witness, to loan out in Sussex on bond and mortgage; for which, when he took the money, he gave a receipt. On his return, he handed the testator the bond and mortgage, and asked for the receipt. The testator appeared to have forgotten that it had been given, and the witness had a great deal of difficulty to make him sensible of it; but it was found and returned to him.

Here was, indeed, a failure of memory; but let us look at the rest of the transaction. The testator spoke to the witness to carry the money for him; told him that Mr. Clark had got a place for it; informed him who the borrower was, where he lived, and that Mr. Clark had told him the property was safe for the money, and directed him to get the bond and mortgage drawn. When the witness returned, the testator recollected having given him the money, and asked him if he had got the mortgage recorded. Here we see the testator not only in the actual management and direction of his pecuniary affairs, but doing so with prudence and circumspection, nor did he overlook the propriety of recording the mortgage.

The other occurrence stated by the witness relates to the pay-ment of the bond from him to the testator, already mentioned. In the latter part of February or the first of March, eighteen hundred and twenty-five, he proposed to pay off this bond. It was a good while before the testator consented to take the money, to which, after a good deal of persuasion, he yielded. Mr. Griggs told him he ought to take interest at six per cent, but he would take no less than seven. The reason he gave for not taking the money, was, as he said, that he did not want it, that it was not due and the witness could not make him take it. It had been due, the witness said, four or five years. After he had conclu-ded to take it, he requested Mr. Stryker, in whose store they were, to go with them to the house and count the money. Bank notes were offered; he said he did not know whether the notes would pass or not, which Griggs then told him he would gua-

rantee. His hand trembled considerably, said the witness, in consequence of which it would have been difficult for him to count the money, and more than that, he would forget and make mistakes. Stryker counted the money, and handed it to him. He put it up, and did not count, or attempt to count it.

We are at a loss, in all this statement, to find the proof of incompetency. He actually did transact, and was suffered by his family and friends to transact his own business to a large amount. Was it in his pertinacious adherence to seven per cent, which he knew he could legally claim? Was it in his reluctance to receive money which was advantageously placed out in the hands of an honest, punctual and able man? Was it in his wariness of bank notes, among the multitude of counterfeits and broken banks, from the latter of which he had recently suffered? Was it in his requesting an experienced and sagacious man of business to examine and count them for him? Was it that he did not count them after that had been done by one in whose care and accuracy he confided, from having frequently tried them—a circumstance which few of us have not witnessed? Was it that he said the money was not due?—an observation readily explained by the fact stated by Mr. Griggs, that the interest on the bond was payable on the first of May, until which time he may have supposed he could not be compelled to receive it; by no means an uncommon error.

Joseph West became acquainted with the testator in February, eighteen hundred and twenty-three, and then rented from him a farm called the Swamp farm, situated in Amwell, and continued his tenant until his decease. He stated, that from his acquaintance with the testator up to August, eighteen hundred and twenty-five, he thought him not capable at that time of doing his own business, and of making a will disposing of his property among his family. We shall briefly advert to the material facts which he states, and on which his opinion was founded. The testator frequently did not know him when he met him in the street, or elsewhere saw him. Their acquaintance commenced in eighteen hundred and twenty-three, a little more than two

years before the will was executed. And the witness says the testator would know him when told who he was.

In making their annual settlements for the rent, which was paid partly in wood and other articles, usually leaving a balance to be paid in money, the testator did not make settlement for himself, but with the aid generally of Mr. Stryker ; seldom, if ever, looked over the accounts, and never counted the money. Let us look at one of these occurrences; and we may take that of the second year, eighteen hundred and twenty-five, in the spring before the will was made. "I went to the testator," says the witness, "when I went to settle the second year's rent, and told him I had come to settle with him. He told me he could not do business as he used to do. I told him we would go to Mr. Stryker's, and we went. [Mark, by the way, West proposed to go to Stryker's.] I handed Mr. Stryker my book, and he went over the account and reckoned it up, and I paid the remainder in money. I don't recollect that the testator looked over my account, and I think that he did not. I handed the money to Mr. Stryker, and he counted it. I got a receipt: Mr. Stryker wrote it and read it to him. Testator did not read it. Testator took no further part in the settlement than merely to sign the receipt." And it may be asked, What further part did Mr. West take than to hand his money to Mr. Stryker? "He appeared to put his dependence pretty much in Mr. Stryker. When Mr. Stryker made a settlement for us, he read my account over to the testator."

Is there any thing remarkable in this narrative? Was it extraordinary he should accept, or even seek, the aid of Mr. Stryker? Or that he did not cast up the account after it was done by an experienced accountant in his presence? Or that he did not look over the account, or count the money, when the one was read to him, and the other counted, by Mr. Stryker? But did the testator understand all this? "I think," says the witness, "he noticed and understood what was going on."

Let us look a little farther at this affair. In the year eighteen hundred and twenty-three the contract for the farm was made,

the terms agreed on, and the price fixed between them; the testator acting for himself. "Towards the close of every year I would ask him," says the witness, "whether he was going to let me stay on the farm." "The second year [this was the year of the will, eighteen hundred and twenty-five] he told me that people said I was doing so well, and making out so well, that he would have to raise the rent on me. This was the only reason he gave. I told him that the place had been improved by me, that I had done a great deal of hard work on it, and that if he did raise the rent I should leave the place." In eighteen hundred and twenty-six and eighteen hundred and twenty-seven, the testator insisted that West should pay more rent. "He would try for a while if I would not give more, and then would say, I do not want to be hard with you, and would let me stay on the old terms." These were the years after the will was made. There seems nothing here to justify the opinion of the witness.

On one occasion, during the first year, Mr. Maxwell went to the farm, which he said was the first time he had been upon it; for it seems he had been compelled to take it at a loss for a debt due him. He came out into the field where West was; gave him no instructions respecting the farm, and took no apparent interest in it; which he thought strange. His advanced age, and the manner in which he became the owner of the farm, may serve in some degree to account for it; he may have made few remarks, and yet have been very close in his observation. Instructions were, perhaps, unnecessary, as it was under lease, and in progress of improvement; and he, perhaps, made inquiries of others, if not of the witness, as we have found him relating what other people told him.

One of the reasons this witness expressly assigns for his opinion that the mind of the testator was growing weak, is an occurrence in respect to some wood. He was bound by his contract to deliver the testator a quantity of cord-wood from the place. The testator found a good deal of fault with the wood he brought, and scolded. On one occasion he said it was green and would not burn. It was so; but West said he could not help that.

West got out of humor, and told him the man who had lived on the place before had said there was no getting along with him, and it was like to turn out so. Mr. Maxwell said, he had never been unreasonable, and after that seemed in a better humor. Now Mr. West may have thought such complaints on the part of his landlord quite misplaced ; but we know that they are by no means uncommon, and oftentimes very just, when the tenant pays his rent in kind.

The old lady, Mrs. Maxwell, used sometimes to tell him the testator was cross and pettish, and not to mind him ; and once, a young woman living in the family told him the like in the testator's presence. And all this may have been said, and it is not uncommon, in order to soothe some irritated feeling in the witness.

John Dilts, on one occasion, coming out of the door of George Rea, esquire, in Flemington, saw the testator feeling along the lower part of Mr. Rea's door-yard fence, for a gate. The testator said, folks are altering their ways and gates so often that I can't find them always, and asked the witness to show him the gate to go in there. The witness helped him through the gate, and the testator said he was old and forgetful, and could not find the way. He mentioned his business there."

Mr. Rea, on his examination, relates the occurrence in substantially the same manner as this witness, and fixes the time at least a year before the date of the will. A new fence and gate had been put up, and in the place of the former, but of a different kind of pales. He mentioned to Mr. Rea his business, which related to a suit he had a short time before instituted before Mr. Rea as a justice. Mr. Rea testifies that what was said by the testator while there at that time, was sensible and to the purpose, though but little. Dilts said, when he first saw him he appeared to be bewildered and lost, as he thought. Mr. Rea said, he seemed to be quite weak and feeble, but could not say whether he seemed bewildered or not. Mr. Rea had known him for many years, but for several years had seldom seen him to converse with him. The testator was sometimes before him on business

as a justice. He mentions one occasion, a short time before the incident stated by Dilts. He talked then but little; his son, a lawyer, was with him. Nothing amiss at that time appears. Mr. Rea mentions an instance when the testator did not recognize him, but as from what he says of the time it may have been after the will, we need not notice it.

George Henry thought he could perceive, in the last few years, a failure in the testator's mind and memory. After the summer of eighteen hundred and twenty-five, the testator would sometimes not know him, and said his eye-sight and memory failed him. The witness thought the testator was not, in August, eighteen hundred and twenty-five, competent to transact his own business generally, and hardly thought he had sufficiently strong mind and memory to dispose of a large real and personal estate by last will and testament. This, he said, was his decided opinion. He states the instance, and says it is the only one in regard to business, on which he founded his opinion as to the testator's incapacity. It relates to the recording of a lease, in April, eighteen hundred and twenty-five, in the clerk's office, where the witness was employed; and there seems to be little more in it than that Mr. Maxwell thought, and perhaps justly, that other persons, and not he, should pay the office fees. He carried it there himself, once inquired whether it was done, and afterwards, being told in the street or the store that if he called he could have it, he did so. The witness says he does not think the testator, during the last five or six years, was able to hold a connected conversation of any length on any subject. Yet he says the remarks of the testator, in answer to his remarks, were like the remarks of ordinary men under like circumstances, quite rational; and he does not recollect whether, from any conversation, he discovered whether he could hold a connected conversation or not. Farther, he says his opinion arises, in part, from the absence of mind of the testator. He would speak of many things in succession which had no connection; yet he says his remarks would be shrewd too, and all point to one object. His remarks were whimsical, though to the pur-

[*Sloan v. Maxwell et al.*]

pose. This witness did not recollect any particular conversation with him in which he exhibited imbecility of mind. He did not think it would have been safe to trust the testator to manage his business, in August, eighteen hundred and twenty-five; yet he did not know whether the testator had or had not mind and memory enough to make bargains with a proper regard to his own interest. He did not think it would have been safe to trust the testator then to make a bargain to buy or sell property of any serious amount, without the advice of others; yet he could buy marketing, and necessaries for his family. And the witness could not say his knowledge of men and things was then very imperfect, although it became so afterwards. One reason, the witness says, and it seems to have considerable influence with him for thinking the testator's mind impaired, was, that he asked so much, three thousand dollars, for his swamp farm. Now he says he heard this price, not from the testator, but from Mr. West. And here is obviously some mistake, for the latter says the testator uniformly set the price at two thousand dollars.

Mary Mullener lived in the family of the testator four or five years, extending both before and after the will was made. He did not always know his grand-children, Mrs. Sherrerd's children, when they came there; but whether this was before or after the will she has not stated. When told their names, he appeared to recollect them. With respect to her wages he did not make a miscalculation of the amount, but adopted a mode of calculation, and not perhaps an unnatural one; which he abandoned when an impartial person told him he thought another mode the correct one. She expresses an opinion qualifiedly. " I do not think he was able to manage all his own business while I lived there." And afterwards said, " I don't know what part of his business he was or was not capable to manage himself." Towards the latter part of the time, but whether before or after the will is not stated, some one was generally called in to assist him when business was to be done. She did not recollect any particular act or thing he said or did while she lived there, that evinced to her he was childish. He had family worship, and as we

75

may infer, all the time she lived there.   In his prayers he would repeat over the same things often.

George Forker underwent a very long examination, and many things he has stated are of little importance.   They relate, chiefly, to work done by him as a carpenter in the repair of a house for the testator, about which a controversy arose between them; whether a sum, admitted by the witness to have been fixed at the outset, was to pay for the whole, or whether extra. work was afterwards agreed to be done and paid for.   He seems to have wished to have as little as possible done by way of repairs, while the carpenter proposed, either from himself or on the suggestion of the tenant, many things more.   They at length fell into a dispute.   The whole occurrence is not an unnatural, and perhaps not an uncommon one.   Mr. Maxwell seems to have been close, and in some instances forgetful of what he had consented to do; although, perhaps, if he had to tell the story he might give these as instances of the failure of the carpenter's memory.   The moral of Æsop's fable of the statue of the man bestride of the lion, should never be forgotten.

The witness being asked whether he considered the testator in August, eighteen hundred and twenty-five, to possess sufficient mind and memory to dispose of a large real and personal estate by will, answered, that he did not think the testator had at the time they commenced dealings, in the preceding month of April.   Yet he made a contract with the witness for the repairs of the house afterwards, and, as the witness says, made a subsequent contract for additional repairs; himself decided and directed throughout what repairs should be done, and they were considerable, his charge for work amounting to one hundred and forty dollars; and upon their difference, they mutually agreed to a reference, by a written instrument, and the testator himself attended and managed his cause before the referees.

Thomas Stout moved to Flemington in the year eighteen hundred and twenty-three, when his acquaintance with the testator commenced.   He was a blacksmith, and was employed by the testator.   When he moved, he thought the testator childish,

[Sloan v. Maxwell et al.]

and saw a failure afterwards. He saw instances of his conduct whereby he formed his opinion. And yet we think the instances he states, with, however, some exceptions, are not very striking or conclusive. When the testator came into his shop, and other persons were there, " he would seem not to know where to go to find the witness." And this is not remarkable, if, as is represented, his eye-sight had somewhat failed, especially as the acquaintance between them was recent. The witness relates a circumstance, before the will, of the testator taking the wrong way for his return from the shop; and some instances are mentioned by him and other witnesses, without fixing the time, of his appearing bewildered or lost in the street. These are, doubtless, unfavorable tokens; but they seem to have been occasional and temporary, not permanent, and may have been in a greater or less degree induced by feebleness of body, and occasional dizziness, to which old age is subject. The witness frequently conversed with him. The testator dwelt much upon revolutionary stories, and "generally repeated the same story a time or two at the same sitting;"—a mark of failure of memory unquestionably, but not uncommon. He had to be made acquainted with the witness when he called at his house. Yet he does not seem to have been thus at a loss when he went to the shop; for he went there frequently to have jobs of work done, went alone, and in all instances seems to have acted unexceptionably in this respect, never forgetting, as the witness says, the job that was to be done. Once, indeed, he took an article to be repaired which did not need it. Sometimes he had a difficulty, and even made mistakes, in selecting money from his pocket to pay small sums for work, and how far owing to his defect of vision we cannot exactly determine; an occurrence, however, not uncommon among old persons. The witness says he does not know that he ever heard the testator make a childish remark, or one altogether void of meaning; has heard him make a remark partly void of meaning; and the instance he gives is, that he remarked he was poor, and the jobs were very highly charged for. Is either of these an extraordinary occurrence? Are they

not often made as little more than words of course? This witness states a circumstance which we need not repeat, as our allusion to it would be readily understood, which betokens a forgetfulness or disregard of propriety of demeanor and self-respect, and of respect for others, which is among the strongest of the proofs of incapacity the caveators have adduced. The witness thinks he observed it soon after he moved to Flemington, which was in April, eighteen hundred and twenty-three. We have no disposition, nor indeed any right from the evidence, to call in question the veracity of this witness, but have our surprise excited that no other witness has mentioned a matter said to have taken place so frequently and so publicly, and to have been by the witness himself pointed out to other persons. Yet it is entitled to be duly weighed in estimating the capacity of the testator.

John Atkinson became acquainted with the testator in the year eighteen hundred and twenty-three. He relates some circumstances which show a failure of memory in the testator. In one instance, he mistook the witness for another man, and spoke to him as such, and was not readily convinced of his error. There are, however, some facts connected with it, which render it less remarkable; and his conversation, the witness says, was connected and consistent, and as any other person would have talked upon a like subject if the man had been right. In the conversation about the lot, in May, eighteen hundred and twenty-five, the part borne by the testator was connected and consistent, and the witness would not have thought strange if he had not been mistaken about the lines. His estimate of the value of the lot being considerably higher than the opinion of the witness, is a very equivocal mark. The witness had seen him lost in the street, and shown him the way home, but whether before or after August, eighteen hundred and twenty-five, he could not say. Some of the instances of failure mentioned by this witness were subsequent to the will, and from them much of the strength of his opinion of the testator may have resulted, more especially as he says his mind does not serve him as to dates. Once, in the

summer of eighteen hundred and twenty-five, on a Sunday, just after public worship, he saw some persons who said the testator was lost, and afterwards saw them returning with him. The inquiries made by the testator respecting the recess in the building in progress of erection for a Methodist church, and the room beneath it, were not extraordinary, as they were made by many others; and the belief of the testator, in the explanation of the latter, so seriously given by Mr. Bonnel, is very equivocal proof.

Two witnesses called by the caveators, as well as one on the part of the probate, speak of the conduct of the testator on the fourth of July, eighteen hundred and twenty-five, when he bore a part in the public exercises of the day, in the character of a revolutionary soldier. He walked in the procession, bearing a copy of the Declaration of Independence, which, on the stage, he delivered, with a few remarks, to the person appointed to read it. Before any inquiry as to his demeanor on that occasion, it will occur, we think, to any one as singular, that his neighbors should select and intrust drivelling old age, or second childhood, for such a duty. George Maxwell, esquire, the surrogate of the county, called by the caveators, relates the transaction. He says, " The old man's speech made a strong impression on his mind. He was pleased with the manner in which the testator delivered it, and had heard people afterwards say they thought he had done extremely well." Even if previously drilled for the speech, it is manifest memory had not entirely yielded up her powers.

The custom of the testator to resort to some store-keeper, lawyer, or other man of business, to make calculations of interest for him, was pressed with some earnestness by the counsel on the argument. Some of the witnesses think he was not equal to the operation himself, and others think he could have calculated for sums or periods simple and without fractions. But we recollect no instance given of his attempt and failure, and these opinions therefore have, we think, little but conjecture to sustain them, and were very probably induced by the custom referred to. When he wanted the calculations, we find him always resort to an apt instrument. He did not go to the pump-handle, or the

horse-block. The value of this custom, in its bearing on the subject before us, may be estimated from the fact stated by Mr. Bonnel, that the testator was in the habit of calling upon him and David Shrope to make calculations of interest for him, as early as eighteen hundred and eighteen, when no one has ventured to doubt his capacity to transact business and make a will.

After this review of the testimony on the part of the caveat, in which, without attempting to recapitulate the whole, or to enter at all times into minute detail, although perhaps enough so to become wearisome to those whose interest may induce them to read it, we have endeavored to exhibit and consider the most prominent points; it is our purpose now briefly to examine the evidence produced in support of the will.

At the outset it deserves, we think, to be remarked, not only that the execution of the will, as already mentioned, was the act of the testator alone, without the interference of any other person, but that the design to make a will, and its contents and provisions, were of the mere motion of the testator, and without persuasion, entreaty or advice, so far as we are informed by the testimony. No fraud is proved, nor do we recollect that the proof was attempted or the charge ever made, directly or indirectly, upon the argument.

One of the most sure, satisfactory and convincing methods of ascertaining the strength of intellect, is to see it in action—to judge of its ability to perform by its actual performance. This test is used in natural philosophy and mechanics, as well as in the science of the mind.

Andrew Vanfleet borrowed money in May and October, eighteen hundred and twenty-five. At the former time he made the contract with the testator personally and alone. The latter sum was three hundred dollars, which was counted out by the testator. When he applied for this loan, Mr. Maxwell told him he could have it if he would give bond and mortgage, but afterwards consented to make the loan on personal security, which on inquiry he found satisfactory. When the witness called for

[Sloan v. Maxwell et al.]

the money, the testator went himself out of the room—Mrs. Maxwell remaining there—brought it with him in bank notes, and counted it aloud without difficulty, the witness looking over the money at the time.   In eighteen hundred and twenty-six he paid the testator the interest, which was counted by him.   The same took place in the spring of eighteen hundred and twenty-seven.   The witness first observed a failure of memory in Octo-, ber, eighteen hundred and twenty-seven; and he relates an instance, but which, from the period of its occurrence, two years after the will was made, needs not to be further noticed.

Elisha R. Johnson borrowed three hundred dollars of the testator in the spring of eighteen hundred and twenty-six.   He made application to him personally in the first place, to know if he could have the money at a given day if he wanted it.   Before that day, and after the lapse of about two weeks, the testator called to know if he would certainly take it.   The witness paid him interest in the spring of eighteen hundred and twenty-seven, and thinks he counted it.   In the spring of eighteen hundred and twenty-seven, the witness settled a note with him which he held against the Presbyterian church in Flemington.   The conversation on the part of the testator was rational and appropriate. The witness said he transacted these matters with the testator on the presumption he was competent, otherwise he would not have done it, and nothing occurred to encounter the presumption. His questions and answers were pertinent.   His mind and memory appeared to have failed in some degree, which the witness considered nothing more than the failure incident to old age.

Rev. Charles Bartolet borrowed money of him in eighteen hundred and twenty-three or eighteen hundred and twenty-four, paid him the interest in the spring of eighteen hundred and twenty-five and eighteen hundred and twenty-six, and then considered him capable of understanding and transacting business.

John T. Blackwell lived in the same village with him for seventeen or eighteen years, and had frequent conversations with him.   Up to August, eighteen hundred and twenty-five, he had not discovered, to his recollection, any thing to induce him to

believe there was a change in his mental capacity. During this period the witness was clerk of the county. Testator had mortgages recorded before and after eighteen hundred and twenty-five, which he pretty generally brought himself to the office.

Paul Kuhl, junior, borrowed money, one hundred dollars, of the testator, in the fall of eighteen hundred and twenty-six. He applied to the testator himself. The testator proposed to go to Stryker's store and have a note drawn; when arrived there he mentioned he wanted a note drawn for one hundred dollars.

In the spring of eighteen hundred and twenty-five he made a loan of money to John Barton, esquire. Being applied to for the loan, he was particular and minute in his inquiries respecting this person, with whom he was unacquainted. He inquired whether he was a good man, and what security he could give. Being told a mortgage; where the land lay? what the value of it? whether incumbered? directed a search to be made at the clerk's office, and a certificate from there being produced, said he was satisfied.

In the fall of eighteen hundred and twenty-five, he was applied to for a loan of money to Runkle Rea. He made reasonable and apt inquiries, and agreed to the loan. And soon after the application was made, as Theodore Ellis was passing the door where the testator was sitting, the testator spoke to him on the subject; told him he understood the witness and Rea were going into business; inquired where, and what business; inquired whether the money could be used to good advantage. Ellis explained, and the testator said he would let Runkle have it. This occurrence was about a month after the execution of the will.

In October, eighteen hundred and twenty-five, he was applied to for money by Andrew Vanfleet; made the proper inquiries as to the security, and did not agree to lend until he received satisfactory information from a suitable person.

In the summer of eighteen hundred and twenty-five, he consulted his attorney respecting a mortgage given by one Rake, which he held by assignment, and on which was an arrearage

of interest. He said there was some difficulty on account of a life estate in the land, said to belong to an old lady. Inquiry having been made by his attorney, he was advised to take no legal proceeding until her death. Several times afterwards he inquired of his own accord of his attorney, the last time in the spring or summer of eighteen hundred and twenty-seven, whether she was living or dead.

In the spring of eighteen hundred and twenty-six, he loaned eight hundred dollars to Joseph Bartles, on personal security. He first inquired if the persons offered were good, and being satisfied on that head, agreed to make the loan.

In the same spring he loaned six hundred dollars to Asa Jones. Elijah Wilson was offered as security. The testator inquired the situation of Jones, and being told Wilson was a good man, then said he could have the money.

In the same spring he made a loan to Isaac Jarvis of one hundred and fifty dollars. Elijah Wilson being again offered as security, the testator remarked, he was almost too free in lending his name.

In the summer of eighteen hundred and twenty-six he loaned Joseph Schenck two hundred dollars, on bond and warrant. The testator handed them to his attorney, with directions to enter up judgment, which was a condition of the loan. In eighteen hundred and twenty-seven the testator went to his attorney, told him Schenck had paid a year's interest, and directed him to indorse it to his credit.

In eighteen hundred and twenty-six, being applied to for a loan, he declined it at first, and afterwards made it on good security. He gave an apt reason for declining it.

In eighteen hundred and twenty-six, he inquired of his attorney whether he sometimes went into Warren county, and finding he did, directed him to call for some interest due him there, which was accordingly procured.

In the spring of eighteen hundred and twenty-seven, a person applied to him to let him have one hundred dollars, on the assignment of a bond and mortgage, which he represented good.
76

The testator said, if so, the assignor could have no objection to being security on it; which was done accordingly.

In the summer or fall of eighteen hundred and twenty-six, he was desirous to have a release from his son's wife, of dower in a lot he had obtained from the son. The reason he gave was, that she had not signed the deed, and if he was to die it would be subject to her dower.

In most of these loans, Mr. Bartles, the attorney employed by Mr. Maxwell, was present at the delivery of the money and the execution of the writings. But he appears, from the evidence, to have done little if any thing more than is common for a scrivener, except in protecting the testator from broken banks and counterfeit notes, and in communicating information to him respecting the solvency, or the goodness as it is called, of applicants for money.

In eighteen hundred and twenty-six, John H. Anderson, standing at the door of his store in the village, heard the testator in the street, dunning one William Case for money. Case promised to come to Flemington the ensuing Thursday, four or five days off, and pay it. He knew Case, for he went out and hailed him. On the day appointed the testator came to the store, asked whether Case had been there, and stated substantially what had passed between them. Anderson discovered no visible change in the mind or memory of the testator until eighteen hundred and twenty-six or eighteen hundred and twenty-seven.

James Callis was the clock-maker of the village, and repaired the testator's clock, at his request, in the spring of eighteen hundred and twenty-six. Having replaced it, the testator paid his charge, one dollar and twenty-five cents, taking the money from his pocket. Callis told him the clock was warranted for a year, and if any thing went wrong to let him know, and he would fix it without further expense. Several months afterwards Mr. Maxwell called and told him something was wrong in the striking. He went, found it as represented, and rectified it; and Mr. Maxwell said he believed the year was not up, and he supposed there would be nothing to pay. The witness first discovered a

[Sloan v. Maxwell et al.]

failure in the testator in eighteen hundred and twenty-seven. The testator appeared always to know him, and generally mentioned his name. The testator was in the habit of attending church and religious meetings until about six months before his death.

In these facts, none of which are drawn from the testimony of Mr. Sloan or Mrs. Lummis, we see Mr. Maxwell not only in the direction and control of his affairs, the disposal of his property, the making of contracts, and the transaction of business, but we find him in the exercise of prudence, caution, judgment and memory; and what he did thus transact, and in this manner, we may, we think, safely conclude he was able to transact.

On the whole, although it cannot be denied there is strong evidence on the part of the caveat, yet on our minds the evidence in support of the will decidedly preponderates. A careful review of the whole evidence leads us to the belief that the testator was, at least, equal to the standard of testamentary capacity and competency which we have mentioned in the preliminary examination of the law on this subject. We are therefore of opinion that the decree of the orphans' court is erroneous, and ought to be reversed; and that a decree of the prerogative court should be made, admitting the instrument propounded to probate as a will of personal estate.

Most respectfully submitted to his excellency the governor and ordinary, by                              CHARLES EWING,
                                                    GEORGE K. DRAKE.


A decree was made by the ordinary in conformity to the foregoing opinion.