In the matter of the appeal from the probate of a paper-writing purporting to be the last will and testament of MARY A. BRENGEL, deceased.

[Submitted February 24th, 1915. Decided April 15th, 1915.]

1. Undue influence which will vitiate a will must be such as so far to destroy the free agency of the testator as to constrain him to do that which is against his will, or that which he would not have done if he had been left to himself. It must be some species of moral or physical coercion, which, under the conditions in which he was placed, he was unable to resist—no matter from what source it comes or what character it appears in, whether it be in the shape of physical force, threats, importunity, or other species of domination.

2. Upon the shifting of the burden of proof to the proponents upon this subject, and assuming that the burden of proof is imposed upon them, it is necessary in determining whether they have successfully borne this burden that regard be had (1) to the amount of the estate at her disposal at the time of executing the will; (2) the natural objects of her bounty; (3) her age, health and ability to resist coercion or importunities which might destroy her free will; (4) her consciousness of the amount of her property and the natural objects of her bounty.

3. When one possessed of a large estate disposes of it by will, favoring children forming part of his household to the exclusion of other children equally the natural objects of his bounty, without any reason appearing for such discrimination, and his condition is such that he is susceptible of coercion and is under the influence of the favored children, the inference of undue influence is much stronger than in a case where, at the time of making the will, the estate is so meagre as to hardly warrant a division; therefore the value of this estate at the time the will was made tends in a measure to negative the inference of undue influence.

4. Evidence *Held* to fail to prove either expressly or by justifiable and fair inference from circumstances that influence was in fact exerted, and that it was exerted to dominate and control the will of the testatrix and coerce her to make a testamentary disposition of her property which she would not otherwise have made.

*Mr. Alexander Simpson,* for the proponent-appellants.

*Mr. Louis G. Morten* and *Mr. Clarence Linn,* for the caveators-appellees.

GRIFFIN, VICE-ORDINARY.

The appeal in this case calls for a review of the decree of the orphans court of the county of Hudson, adjudging that a paperwriting purporting to be the last will and testament of Mary A. Brengel, deceased, "was the result of undue influence on the part of the proponents."

The will, after giving to her two daughters Mary Baker and Elizabeth Brengel, her clothing, jewelry and personal apparel, and to each of her children one dollar, gave the residue to her daughters Mary and Elizabeth, and her son Andrew A. Brengel.

On the date of executing the will (September 21st, 1910), and the date of her death (September 5th, 1912), the natural objects of her bounty were her six children, viz., Andrew A., Elizabeth, Mary Baker, Jacob, Adam and Annie Himsel. The caveators are Jacob Brengel and Annie Himsel.

The value of the property at the disposal of the testatrix at the time of the making of her will was not shown in the orphans court. By stipulation entered into in this court, it appears that she owned personal property not exceeding $100 in value—she had no real estate.

Jacob, Adam and Annie were married and lived away from the home of the testatrix for twenty-five years and upwards. Andrew and Elizabeth were unmarried. Mary Baker was then, and still is, a widow. Elizabeth is a deaf mute. Adam, the son who did not contest, resided in California. The others all resided in Hudson county.

The household of the testatrix for upwards of twenty-five years consisted of the testatrix, her son Andrew and her daughters Elizabeth and Mary. During all this period the three beneficiaries worked and used their earnings largely for the support of the household. The only other source of income was the sum of about $300 contributed annually by Mrs. Givernaud to the testatrix for coal and other purposes. Andrew estimates that during the period they lived together he and his sister spent upwards of $3,000 for taxes, insurance, repairs, &c. During this period the other children did not contribute to the support of their mother, because they say she would not take anything from them. It does appear, however, that the premises occupied by the testatrix and proponents were held by all the children as tenants in common, subject to the dower right of the testatrix, and no claim was asserted by the caveators for compensation for such use. The caveators also joined with the other children in giving to the testatrix their shares of the proceeds of the sale of a patent owned by their father, which sold for about $1,250, which shares, after deducting the testatrix's one-third, amounted to about $140 each.

The evidence shows that the children residing in Hudson county were somewhat peculiar. They were not harmonious. Jacob, especially, showed that he had very little love for his mother, a fact which clearly appears in his letter of October 24th, 1905, which was a reply to a letter written him by his brother Andrew on the same date. This correspondence is as follows:

"JERSEY CITY, Oct. 24th, 1905.
*"Brother Jacob:*

"Lizzie is somewhat improved, but the doctor says that it is necessary in order for her in her present condition to have absolute quiet, and no visitors whatever, therefore do not call and if anything serious occurs you will be notified.

"Your brother,

"ANDREW A. BRENGEL."

"JERSEY CITY, N. J., Oct. 24/05.
*"Mr. A. A. Brengel:*

"DEAR SIR—Enclosed you will find your letter and I wish to thank you for the information.

"I. am very sorry for Lizzie and there is nothing that I wouldn't do for her, but as the poor misfortunate girl has the misfortion to be taken care of by you I find that I am unable to do as I would very much like to.

"I am also sorry that I am related to such as you, and I never wish to claim any relationship with any of you, or anyone you know and should anything happen to poor Lizzie it might be a great deal better for her than to be under the care of you. In case anything should occure I don't wish to be notified as for poor Lizzie I cannot help her and the rest I don't care to know.

"As for writing letters please don't write any more as I do not wish to be disgraced through the mail. I haven't very much education myself, but I can write an address better than this. I cannot blame anyone for this but your mother and if it wasn't for her and her old church running we may all be better off to-day. There was only one good person in the family and that was my father and I am trying to be as much like him as I can and I am going to treat my family as he treated his and not as they are being treated now like a lot of animals. I am sure if he was alive to-day the lot of you wouldn't be as pig-headed as you are.

"Very truly yours,

"JACOB BRENGEL."

The other caveator, Annie Himsel, married about twenty-five years before the death of her mother, and had' twelve children. Her domestic relations were not very pleasant. At one time her husband threatened to shoot her, and she called on her brother Andrew to secure for her police protection. She was in the habit of calling on her mother to unbosom her troubles; according to her own story, Mary Baker objected to her doing this, telling her that she might better keep from the house. The evidence demonstrates that Mary and Andrew desired that Annie and Jacob should not visit their mother, and when they did call either Andrew or Mary stayed in the room; thus neither could talk privately with her. There is also evidence that the mother had a natural affection for all her children. When she met the caveators

in the street alone she was very pleasant; but when the propo-
nents, Andrew and Mary, were present, she was rather distant
and anxious to have the caveators depart.

The facts, with relation to the execution of the will, are as
follows:

The testatrix, with her daughter Mary, went to the office of
Mr. George J. McEwan, a reputable member of the bar of the
county of Hudson, to make inquiry as to her rights in the prop-
erty wherein she resided, and was informed that she only had a
dower right. After advising her as above, Mr. McEwan says:

> "Then there was some talk about a will, and I said to Mrs. Brengel
> in the presence of Mrs. Baker that if there was a will to be prepared,
> I wanted her to come to my office alone and I would then take instruc-
> tions and prepare the will, and on the 19th day of September, as I say,
> she came to my office."

He further says she was in his private office with him alone,
she gave him the instructions for the will, he had it typewritten,
and, on the date of the will, she returned and executed it in his
private office, the only persons present being the testatrix, the
witnesses and himself. Whether anyone accompanied her and
was in his outer office at the time she gave the data for and
executed the will, Mr. McEwan does not know, nor does it appear.
Andrew and Mary say positively that they knew nothing of the
existence of a will until a few days before their mother's death,
when testatrix informed them of the fact. About three weeks
before the death of the testatrix her sister Mrs. Rohleder died,
leaving the testatrix a legacy of $5,000; this is practically all of
the property passing under the will of the testatrix. After the
death of Mrs. Rohleder, Mrs. Givernaud, another sister of the
testatrix, called on the testatrix, and apparently attempted to in-
fluence her in the making of a will, because it was then known
that Mrs. Rohleder had given the testatrix $5,000. Mrs. Giver-
naud says she personally desired that this legacy should go to
all of the children equally, because that was the wish of Mrs.
Rohleder.

The caveators seek an affirmance of the decree on the ground
that it appears from the evidence taken in the orphans court, and

that admitted by stipulation in this court, the will was the product of undue influence.

Undue influence was defined by Chancellor McGill, sitting as ordinary in the case of *Fritz* v. *Turner, 46 N. J. Eq. 515,* as follows:

"That influence, which will vitiate a will, must be such as so far to destroy the free agency of the testator as to constrain him to do that which is against his will, or that which he would not have done if he had been left to himself. It must be some species of moral or physical coercion, which, under the conditions in which he was placed, he was unable to resist—no matter from what source it comes or what character it appears in, whether it be in the shape of physical force, threats, importunity or other species of domination. *Den, Trumbull,* v. *Gibbons, 22 N. J. Law 117, 136; Moore* v. *Blauvelt, 2 McCart. 367; Lynch* v. *Clements, 24 N. J. Eq. 431; Haydock* v. *Haydock, 33 N. J. Eq. 494, 496; Same Case on appeal, 34 N. J. Eq. 570; Waddington* v. *Buzby, 45 N. J. Eq. 173; Dumont* v. *Dumont, 46 N. J. Eq. 223.*"

In the same case the ordinary referred to the character of proof from which the inference of undue influence might be drawn, thus shifting the burden of proof to the proponents.

Under the above ruling I will assume that the burden of proof is imposed upon the proponents. It is, therefore, necessary to determine whether the proponents have successfully borne this burden.

In considering this question, regard should be had to (1) the amount of the estate at her disposal at the time of executing the will; (2) the natural objects of her bounty; (3) her age, health and ability to resist coercion or importunities which might destroy her free will; (4) her consciousness of the amount of her property and the natural objects of her bounty.

Dealing with the above items, there was no proof before the orphans court of the value of the estate at the time of making the will; had it appeared that her entire property at that time did not exceed in value $100, hardly sufficient for funeral expenses, the view of the court might have been different.

When one possessed of a large estate disposes of it by will, favoring children forming part of his household to the exclusion of other children equally the natural objects of his bounty, without any reason appearing for such discrimination, and his condition is such that he is susceptible of coercion, and is under the influence of the favored children, the inference of undue influence is much stronger than in a case where, at the time of making the will, the estate is so meagre as to hardly warrant a division; therefore, the value of this estate at the time the will was made tends, in a measure, to negative the inference of undue influence.

While the natural objects of testatrix's bounty were all her children, yet, considering the size of the estate she then had to dispose of, the proponents, by reason of their long and faithful care of and service to their mother, coupled with the fact that one was a deaf mute, were in a class superior in right to the bounty of their mother. On the contrary, the conduct of the son Jacob, and her annoyance by the daughter Annie, who lived away from her for upwards of a quarter of a century, would naturally lead to her ignoring them in the disposition of this small estate.

Touching the age (seventy years), condition of health and power of resistance under coercion, I am satisfied she was so situated as to yield to the pressure of proponents if exerted.

As to knowledge of the amount of property she had to dispose of, and the objects of her bounty, she knew after consulting Mr. McEwan·that she had but a dower right in her residence; and had sufficient mental capacity to comprehend the amount of her property then remaining; and, finally, as the evidence clearly shows that her relation with the caveators were friendly, she clearly knew the objects of her bounty.

While the inference of undue influence is greatly weakened on the foregoing facts, the proponents by their case go further. They testify that they did not exercise influence upon their mother to make this will; that they did not know of its existence until a few days before her death and after the death of Mrs. Rohleder. Their evidence as to this is not impeached, and,

in the nature of the case, is the only evidence they could offer. *Spark's Case, 63 N. J. Eq. 242, 249.*

No testimony offered by the caveators increases the force of the inference of undue influence, overcoming or even balancing the proof against it. While it is apparent that Mary and Andrew disliked Annie and Jacob, and endeavored to keep them away from their mother, the motive was to protect her as much as possible from annoyance. This appears in the testimony of Annie, where, both on direct and cross-examination, she says Mary did not want her coming to their home telling her troubles to her mother; and as to Jacob, if his love for his mother was measured by the views in his letter to Andrew, Mary and Andrew might properly be excused for endeavoring to keep him away from her.

It would therefore seem that the force impelling Mary and Andrew to exclude the caveators from the presence of their mother sprung from their love and affection for her. There is no evidence that their course was taken to enable them to secure the making of a will in their favor. The evidence is to the contrary.

A suggestion is made here that the size of the estate at the time the will was executed should be ignored, because testatrix had rich relatives from whom she might receive considerable property by descent, devise and bequest, and that the will was accordingly made to dispose not particularly of what she then had, but what by chance might thereafter fall to her. The case does not present any evidence to support such suggestion. For aught that appears, this idea is presented for the first time in this court.

It is also argued that the proponents, at and about the time the will was read, admitted that they had perpetrated a great wrong on the caveators touching the making of the will. I find, however, no evidence to support such contention. A careful reading of the testimony on this subject does not indicate an admission that the proponents, or either of them, had done any act or thing for the purpose of inducing their mother to make the will in question. The admissions testified to seem largely to deal with the unpleasant family relations theretofore existing,

and the wrong referred to was the manner in which the proponents treated the caveators. These admissions were apparently made with the idea of restoring family harmony.

In this case it does not appear either expressly or by justifiable and fair inference from circumstances proved that influence was in fact exerted, and that it was exerted to dominate and control the will of the testatrix and coerce her to make a testamentary disposition of her property which she would not otherwise have made. *Schuchhardt* v. *Schuchhardt, 62 N. J. Eq. 710; In re Eatley's Will, 82 N. J. Eq. 591; Combes* v. *Carthew, 59 N. J. Eq. 638, 641* (bill to vacate a deed); *Gardiner* v. *Gardiner, 34 N. Y. 155, 161.*

In considering this case, I have been somewhat embarrassed because no memorandum was filed in the orphans court giving the reasons for the decree entered, thereby rendering it necessary to pass upon the case without the light which the views of the court below would shed. In doing this, considering that the orphans court had the benefit of seeing the witnesses and hearing them testify, and was thus better able to pass upon the weight and credibility of the testimony given, every fact that might be reasonably resolved against the proponents has been so treated. Having done this, and considering the evidence thus ascertained in connection with the evidence offered by stipulation in this court as to the value of the property possessed by testatrix when she made her will, my conclusion is that the will offered for probate was not induced by undue influence exerted by the proponents upon the testatrix, and I will therefore advise a decree of reversal.