HUDSON COUNTY ORPHANS COURT.

In the matter of the application for probate of the last will and testament of FRANK LOH, deceased.

[Decided November 9th, 1925.]

Wills—Probate—Testamentary Capacity—Undue Influence and Fraud—Testator, a Person of Unusual Will Power—Last Days Brought Much Suffering and Probably Weakened His Mind, But There Was Clearly Intelligence to Control His Business Affairs—Hallucinations Regarding Legitimacy of Two Children Not Sufficient to Show Mental Incapacity—No Evidence of Undue Influence or Fraud.

*Mr. Charles W. Kappes,* for the proponents.

*Mr. Emil Walscheid,* for the caveators.

EGAN, JUDGE.

Frank Loh, a resident of Weehawken, Hudson county, died on December 26th, 1924, leaving a paper-writing purporting to be his last will and testament, against the probate of which caveats were filed ·by Marie Goelz and Louis Loh, a daughter and son, respectively, of the decedent. Many hearings were held at which was submitted considerable testimony about the decedent's life, his utterances and his actions. The will offered for probate was the fourth one decedent had made. The first will was executed before the death of the decedent's wife, which happened some time in March, 1923. In April, 1924, he made a second will, and the third will was executed in September, 1924, and the last one was executed on December 17th, 1924.

The wills of April, September and December, 1924, are alike, excepting a change made in the naming of the executors. The gifts and beneficiaries are the same.

The caveators contend that (a) the testator lacked testamentary capacity and that (b) the wills were the product of undue influence and fraud.

The assets of the estate, the proponents assert, amount to about one hundred and fifty thousand ($150,000) dollars, while the caveators contend they amount in the neighborhood of two hundred and sixteen thousand ($216,000) dollars. The testator bequeathed to his daughter, Marie Goelz (one of the caveators), the sum of ten thousand ($10,000) dollars; to his son, Louis Loh (one of the caveators), the sum of five thousand ($5,000) dollars; to his two grandchildren (the children of his son, Louis Loh) he bequeathed the sum of five thousand ($5,000) dollars each; to his grandchild Marie Brown (a child of his deceased daughter, Barbara) he bequeathed the sum of five thousand ($5,000) dollars. The residue or remainder of his estate was bequeathed and devised in equal shares to the three proponents—Frank Loh, a son; Margaret Franz, a daughter, and Emilie Loh, a daughter. If an equal distribution of the estate were made, the children entitled to share in the estate would receive a one-sixth part which, under the proponents' figures, would be about twenty-five thousand ($25,000) dollars for each, and, under the caveators' figures, would be about thirty-six thousand ($36,000) dollars for each.

The decedent acquired his estate through lifelong methods of thrift, energy, industry and frugality. He was an incessant worker and a close bargainer, strong willed and intolerant when his judgment was questioned, easily irritated, and quick to resent any interference in or with his business or household matters, where he assumed to be the sole and unqualified master. He was pronounced in his likes and dislikes. Many months before his death he became afflicted with a chronic heart affection, chronic nephritis and diabetes malitis, which seriously affected his physical condition. He suffered considerable pain at times, but, notwithstanding, he was able to discuss affairs and business in which he was interested in a thorough, competent and intelligent manner. He fully described his feelings and explained his condition to his family physician, discoursed with him about his ailment and also topics of the times; conversed with his lawyers

about his legal and business affairs, with his spiritual adviser about his religious duties, and also spoke with him of things of mutual interest to both. He talked, now and then, with relatives and friends about differences he had with his two children, Marie and Louis, their attitude and conduct towards him and his affairs; at times he questioned their legitimacy. Counsel for the caveators contend that he suffered with an insane delusion that Marie and Louis were not his children, and that because of this delusion he lacked testamentary capacity. There is evidence that at times he expressed doubt as to the legitimacy of the two children. Again, he spoke of these same children with regard and affection. But in each will he executed, he remembered them and made them legatees to the same extent that he did in the last will. On occasions he was peevish and stubborn about these children, but that attitude cannot be confounded with mental incapacity. *Ward* v. *Harrison, 3 N. J. Adv. R. 470.* The fact that decedent, at irregular intervals, acted and spoke peculiarly may be indicative of mental decay, but they do not establish mental incapacity; all the attending circumstances must be considered and, if out of it appears that decedent is capable of recollecting of what his property consists, and who, in consequence of ties of blood or friendship, should be the objects of his bounty, and has a mind sufficiently sound to enable him to know and understand what disposition he wants made of his property after his death, he is deemed competent. *Ibid.*

I do not think that the evidence shows the testator had a fixed delusion that his children, Marie and Louis, were illegitimate. The fact that they were beneficiaries under his wills, if there were no other evidence, would contribute somewhat to that belief, and this, though there were disparity in the amounts bequeathed to the caveators and the so-called favored ones.

Only a short time before his death, and close to the time of the execution of the last will, decedent discussed with his attorney, on several occasions, the terms and conditions of

several contracts to convey portions of his real estate, and he executed those contracts; during the discussion of execution of the contracts he displayed sagacity and decision which was indicative of testamentary capacity. *Loveridge* v. *Brown, 3 N. J. Adv. R. 1050, 1061.* The right of the testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition, so long as he has intelligence to exert it, has been inflexibly maintained by the courts of this state. *Ibid.*

There is no doubt in my mind that the testator, at the time of the execution of his last will and testament, fully comprehended the property he sought to devise, and that he comprehended the objects of his bounty, and that he thoroughly understood the meaning of the business in which he was, at the time, engaged. *In re Freeman, 3 N. J. Adv. R. 484.*

The decedent for some time prior to February 21st, 1924, had been visiting his physician and receiving treatment for his ailments. After that date and at different intervals up to April 15th, 1924, on which day he sailed for Europe with his daughter, Emilie, his family physician attended him at his (decedent's) home. While he was weak, physically, he was able to, and did, direct the conduct of his affairs. On April 11th, 1924, he testified intelligently and competently in *certiorari* proceedings, in which he was the prosecutor. Upon his return from Europe, the latter part of June, 1924, he engaged his son, Frank, to look after his realty interests in the place of his daughter Margaret, who had been attending to those matters while he was in Europe. Margaret was married and had one infant child to care for; with her husband and child they took up their residence with decedent upon his return from Europe. She and her sister, Emilie, who also resided with decedent, cared for and assisted him. The son, Louis, had marital and other difficulties that caused him to lose favor with his father. The caveators contend that the proximity and constant presence of the proponents in the testator's home was ground for suspicion, and that

the difficulties of Louis were frequently discussed, enhanced and exaggerated, and colored and exploited in an adverse. and unfavorable light by the children Frank, Margaret and Emilie to the decedent to the disadvantage of Louis. The proponents strongly denied the allegations of the caveators, and offered testimony intending to show that their efforts were enlisted in several endeavors to bring Louis back into the favor of decedent. There was testimony by relatives that proponents, during decedent's illness, prevented them from visiting the decedent in his "sick room," and that, in effect, they were always on guard to prevent anyone but themselves from seeing or visiting him. This evidence was offered to show that the decedent was dominated by the proponents, and under their insidious control, all of which resulted to the detriment of the caveators.

A review of all the evidence does not incline me to the favor of the caveators' argument, nor to the belief that the proponents exercised any undue influence; nor do I accept the contention of the caveators that all the circumstances surrounding the execution of the wills suggest the unerring inference of fraud; there is no satisfactory conviction of such a situation. The fact that the proponents were constantly in attendance upon the decedent, after his return from Europe, even to the exclusion of all others, is not, in itself, conclusive evidence of undue influence; it may be suggestive of an unfavorable presumption, but in the case *sub judice* the decedent had unlimited opportunity before his trip to Europe and after his return therefrom to free himself from the influence against which the caveators complain. He was in close and private conference with his physician, his spiritual adviser, two different legal advisers and numerous friends. If there were undue influence it was not such as to destroy the free agency of the testator, and which amounted to moral and physical coercion. It has not been established that the acts performed in the execution of the wills were the results of such coercion. The testator's body was undoubtedly racked by his illness, his mind, consequently, may

have been enfeebled, but his intelligence to exert control over his property and business affairs at no time appears in doubt. The standard of testamentary capacity has been fixed at a very low point in the scale of intelligence. The right of the testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition, so long as he has intelligence to exert it, has been inflexibly maintained by the courts of this state. The caveators were burdened with the obligation of showing that the proponents, or some other person, exercised a control over the mind of the testator, or practiced an importunity which he could not resist. *Loveridge* v. *Brown, 3 N. J. Adv. R. 1050, 1061.* This they have not shown.

Under all the circumstances, the paper-writing offered in evidence as the last will and testament of Frank Loh, deceased, will be received in evidence and admitted for probate as such.