The bill is to set aside conveyances of land on the grounds of mental incompetency of the grantor and fraudulent imposition upon him.
Peter J. McDonald owned the saloon property at the southwest corner of High and Academy streets, Newark, and the house adjoining on High street. On March 23d 1921, he conveyed the house to an intermediary who reconveyed it to McDonald and his wife, as tenants by the entirety. On April 28th following, he conveyed to his wife, *Page 44 
through an intermediary, the saloon property. He died in March, 1925, at the State Hospital for the Insane at Trenton, intestate, leaving his widow, the defendant. The complainant, his sister, is his only heir-at-law. She seeks to set aside the deeds, charging that they were made by the deceased while insane; that undue influence was exerted upon him by his wife; and that he had not the benefit of competent and independent advice.
The saloon property belonged to the mother and step-father of McDonald as tenants in common. The two had for years conducted the saloon. Upon the mother's death in 1914, McDonald took over the business. The mother left a will, giving her share to a trustee for her two children, McDonald and the complainant, with power to convey to them. Later the step-father and the trustee joined in a deed conveying the saloon property to McDonald individually and as trustee for the complainant. In July, 1918, McDonald and his wife gave the complainant a mortgage on the saloon property for $8,000 and the mortgage recites that it is in full payment of her share in their mother's estate. No deed appears from the complainant to her brother and she says she never gave one. The house next door was purchased by McDonald after his marriage to the defendant.
McDonald, in the saloon business for years, had been a heavy drinker. He stopped drinking in June, 1920, and quit the saloon business in October following. About April 1st, 1921, he moved to a farm at Matawan. His extreme nervousness prompted his wife to consult a physician who sent him for observation to the Newark City Hospital, April 25th, 1921. Eight days later she took him to a private sanitarium where he stayed until the following October. Thereafter he was with her at her mother's home or down on the farm until January, 1923, when he was taken to the State Hospital at Trenton, where he died two years later. During his stay at Trenton he was out on leave with his wife three times, on the farm or at her mother's home, the last time, from May, 1924, to February, 1925. He suffered from mental *Page 45 
depression, the result, no doubt, of intemperance. Prohibition was imminent and he was downcast. He had combined to bootleg, withdrew, reneged on his confederates and was ashamed to face them. He became reclusive. He was obsessed with the idea that, guilty of adultery, he had committed an unpardonable sin; that was his insane delusion and prayer was his solace. The onset was in October, 1920. His mental disorder was intermittent; a month following the first seizure he tried suicide. He was better and worse by turns until he died five years later. That he was a sick man when he made the deeds is not to be denied, but that he was incompetent is far from being established. He carried on his affairs normally until his wife took over the task in May, 1921. He made out his income tax report for that year with the aid of a lawyer. Up to as late as April 15th, 1921, he drew checks on his bank account; on January 6th, 1921, he gave one to the complainant for $200 for his semi-annual interest on the mortgage she held on the saloon property. When they went to the farm at Matawan on April 1st he drove the car. There is no proof that he was incompetent at the time he executed the deeds nor are there any circumstances from which mental incompetency is a fair deduction. He was morbid. The delusion to which he was subject was unrelated to the transactions and is an irrelevant incident to the present inquiry. Middleditch v. Williams, 45 N.J. Eq. 726.
The test of mental capacity is whether he possessed sufficient mind to understand in a reasonable manner the nature and effect of the act he was engaged in. Wilkinson v. Sherman,45 N.J. Eq. 413. Though he was not incompetent, the condition of McDonald's health and his admitted dependence upon his wife, however, puts upon her the burden of showing that he understood what he was doing when he made the deeds and that he was not unduly influenced. Haydock v. Haydock, 34 N.J. Eq. 570; Post
v. Hagan, 71 N.J. Eq. 234. If this be shown, the deed for the house, which was at the time but a part of his estate and vested the title in himself and his wife as tenants by the *Page 46 
entirety, is sustainable, but the deed for the saloon property stands upon an entirely different footing. That was all he had remaining; he stripped himself, impoverished himself, and before the law will permit the improvident act to stand, it must be shown not only that he understood and was not unfairly influenced, but also that he was independently and competently advised of the nature of the act and of its consequences. It is not pretended that the deceased had competent and independent advice and the deed must go down under the doctrine of Slack v.Rees, 66 N.J. Eq. 447; Reeves v. White, 84 N.J. Eq. 661.
It remains to be seen whether the deed for the house can be upheld. The testimony is in great confusion as to the circumstances under which the deeds were executed, due in part to the elapse of nearly ten years and mostly to the defendant's failure to distinguish and separate the events leading to the two deeds, overlapping as they were, and her indefiniteness and crossing of references to them, but a careful reading and analysis of the testimony permits of this interpetration and deduction: After McDonald quit the saloon business, in October, 1920, he had opportunity to rent the building, and at his direction the wife went to his lawyer, Mr. Murphy, to arrange for a lease which she intended to sign, and was told she could not because the title was not in their joint names as she had supposed and as she had understood from what her husband had told her when they gave the complainant the $8,000 mortgage in settlement, which Murphy had drawn. It is strange that no deed is to be found. She displayed anger to her husband upon learning the fact, and told him she had been tricked, although he seemed to have been of the impression that the saloon property was held jointly and was not unwilling that it should be. It was then arranged that she take it over (she says his share) so that she could lease and manage it during his illness. She seemed to think that she owned the other half although she knew she had no deed. Irked by Murphy, she had gone to Mr. Long, a lawyer, and laid the matter before *Page 47 
him and he later called at their home. Whether the lease was discussed does not appear, but Long says that McDonald did talk about the making of a will and wanted to know whether there was any other way he could provide for his wife; that he didn't care about making a will, and was told he could either make a will or deed. Now, the conveyance of the joint interest in the house, it would appear, was a thing apart from the proposed conveyance of the saloon property. That was for the wife's protection — a gift, while the plans concerning the saloon property, in the initial stages, as she understood and explains, were to give her the power of leasing and the convenient managing of the property during her husband's illness. This planning, apparently, was in suspense or perhaps abandoned when the two went to Mr. Long's office where the deed for the house was drawn. The day was their common birthday, March 23d, and that had something to do with it. McDonald, according to Long and the defendant, wanted the house transferred to the name of the two for her protection. Long says that while he looked sick, he (Long) has no question but that he knew what he was doing. It was a most natural and humane thing to do. They were childless and the deed was intended as a post mortem provision for her. There is nothing inherent in the transaction that suggests unfairness or advantage taken, and the conviction is strong that the deceased was impelled solely by his solicitude for his wife's welfare. Even had she, after her disappointment in regard to the title to the saloon property, prevailed upon him to join her with him in the ownership of the house, of which there is no evidence, persuasion to respond to a natural impulse would not be undue influence. Providing for the relict is the husband's duty and the wife's right. In such circumstances, entreaty is not frowned upon and urge is not condemned in law, as that sort of influence "that destroys free agency and constrains the person whose act is brought in judgment to do that what is against his will, and what he would not have done if left to himself." Earle v. Norfolk and New Brunswick *Page 48 Hosiery Co., 36 N.J. Eq. 188. Long's recollection is hazy, and his testimony sometimes confusing and although the memory of the defendant is tenacious enough, her thought and speech conflict and her mind is muddled, but through the mist it can be seen that the conveyance of the saloon property a month later was a separate and distinct affair, a step in the earlier plans for its conservation. Mr. Long drew the deed; it was executed in the Newark City Hospital. He is not able to recall who gave him instructions, but he did not know that McDonald was in the institution under psychiatrical observation and his opinion was that he fully understood the nature of the transactions and its purpose. Were the question as to the deed the single one, whether the grantor was competent or not, the answer would have to be in the affirmative. The evidence would justify no other verdict.Lozier v. Shields, 23 N.J. Eq. 509.
The prayer of the bill as to the house is denied; as to the saloon property, it is granted. *Page 49