This is an appeal from an order of the orphans court of Hudson county admitting to probate a paper-writing purporting to be the last will and testament of Gussie Langendorf, deceased. The will was executed December 10th, 1932. The *Page 120 
testatrix departed this life at Union City, in the county of Hudson, in the State of New Jersey, on October 11th, 1933, leaving her surviving as her heirs-at-law and next of kin five nieces and a nephew of the half-blood.
The contestants question the validity of the will upon the grounds of lack of testamentary capacity and undue influence exercised by one Benjamin Freeman (now deceased), the sole beneficiary, and others in his behalf. Freeman was not related to the testatrix.
The testatrix, at the time of her death, was about seventy years old — or, as some witnesses testified "in her late sixties." She was unmarried.
The appellants went back twenty-five years before the death of the decedent, showing within that time, at certain intervals, that she had acted queerly and abnormally. On occasions within that period, she created disturbances on the public streets by kicking and dancing there in the presence of onlookers; again, by throwing her hands in the air; and at times, conversing with or talking to "invisible beings." There were moments in her home, during said period, when she would be engaged in a conversation with some person, then present, to suddenly cease in the middle of it, and then talk to "invisible beings," and to respond to "invisible voices."
The testatrix' sister, Lizzie Reiser, predeceased her by about four years, having died in January, 1929. She and Mrs. Reiser, up to the time of Mrs. Reiser's death, lived together at 396 Central avenue, Jersey City, New Jersey, which premises they owned. Occupying the street floor of the same premises, where he conducted a pawnshop, was Benjamin Freeman, the chief beneficiary; he paid a monthly rent of $40 to the testatrix. Freeman had been on very friendly terms with Mrs. Reiser and the testatrix.
Approximately six months after Mrs. Reiser's death, the testatrix asked Ben Freeman, and his brother, Oscar, with whom he was engaged in business, to purchase the premises aforesaid. Freeman assented and agreed to pay the sum of $7,500 for it — $1,000 in cash and the balance of $6,500 on bond and mortgage. The testatrix then consulted her attorney, *Page 121 
Robert Hillas, about the transaction. Hillas was called as a witness by the appellant caveators. He advised the decedent that the sum of $7,500 was an unreasonably low figure — much below the real value of the premises. He attempted to dissuade her from going through with the agreement because it was such "a ridiculously low price." She declared that she was aware of the fact, and told him that "the property was a nuisance to her and had been for a long while;" but she wanted the Freeman brothers to have it. When Hillas on this last occasion cautioned her, she said to him: "That will do. I intend to give everything I have at the time of my death, by will, to Ben Freeman, and I want `them' to have the property." She chided Hillas for intermeddling in the matter and for his attempts to change her mind in reference to the price. She conveyed the property to Freeman. There had been no written contract to convey entered into between the parties. Hillas insisted upon drawing a contract, but the testatrix insisted it was a "friendly agreement" and that no written contract was necessary. The testatrix, at the time of the conveyance, appeared in Hillas' office with the Freemans and Benjamin Gordon, who was the attorney of the Freemans. Hillas said, that at the time of the transaction, the testatrix had shown every indication of knowing what she was doing, and that she understood the business in hand. He said there was nothing peculiar about her actions at the time. He, however, did observe that the testatrix had "peculiarities," and that she "dressed as a woman of the period of 1870." This peculiarity of dress, he said, she had evidenced for all of the fifteen years he had known her.
The property which she conveyed to Freeman was concededly worth $30,000. The Freemans held the title to it for approximately a year and a half when they sold it for the sum of $32,500. Oscar Freeman and Benjamin Gordon, in their testimony, stated that they were aware of the true value of the property and that the testatrix also was; but it was her wish, and her desire, that the Freemans should have it. *Page 122 
Hillas further testified that the last time he spoke to the testatrix was in December, 1932. He, at the time, was gazing at a poster of "movies" on Central avenue, Jersey City, when the testatrix approached him and wished him a "Merry Christmas." They then discussed the character of that moving picture and she declared that she would not go to see it because "it is vulgar and common and indecent." They had a further talk about it, and about the book upon which it was based. She, at the time, also said that she, on several occasions, had sought, without success, to reach him at his office in order to have him prepare her will. She criticised him for not being there. She stated that due to her inability to find him, she had been obliged to procure another attorney who prepared her will. She then told Hillas that she had "left Benjamin Freeman everything she had." The witness further testified that sometime about the Easter of 1929, she said to him: "You know I have distant relatives — what I want to find out from you is if I die without a will can these distant relatives claim an interest in my property?" The witness replied, "yes;" whereupon, she said, "then that will never do — I want Benjamin Freeman to get whatever I have."
The testatrix became acquainted with the attorney, Harold B. Lightdale, who drew her will, in this way: Her landlord instituted dispossess proceedings against her; upon being served with the papers in the action, she consulted Ben Freeman who discussed the matter with his nephew, a New York lawyer; that lawyer, with Freeman, then called upon Lightdale. Lightdale and Freeman visited the testatrix at her home. They conversed with her about the dispossess proceedings. During the conversation, Freeman left the gathering "to see the testatrix' landlord and go over the matter with him." Lightdale remained with the testatrix. Lightdale testified that the testatrix then spoke to him about preparing her will. That was on December 8th, 1932. An appointment then and there was made for Lightdale to call the following day to get instructions about the will from the testatrix. He called upon her the following day. The testatrix then told Lightdale to draw her will, and said that she *Page 123 
desired to leave all she had to her friend Ben Freeman for the "many things he had done for her." She also directed that Lightdale be named the executor of the will. Lightdale prepared the will. On December 10th, 1932, he called at the testatrix' home with his brother-in-law, Isidore Raynes. Lightdale then read the will to the testatrix and she in turn read it and then announced that "it was all right." She then signed it in the presence of Lightdale and Raynes and requested them to sign as witnesses. They did. She then turned the will over to Lightdale, who retained it.
Doctor Edgar testified in behalf of the appellants to the effect that he had been acquainted with the testatrix and her sister, Mrs. Reiser; that he had attended Mrs. Reiser in her last illness and had made about eight visits to her. He had never attended the testatrix. That during his visits to Mrs. Reiser he observed the testatrix; he said "the main thing that impressed me was the fact that she suffered from delusions, delusions particularly relating to wealth and also of a religious nature. * * * She spoke invariably of her relations with the church she used to attend, and that I used to attend, and how much she was going to do for the church. The pastor himself was to receive a million and the church also was to receive a million." The witness further testified that he had "observed her on Central avenue; that she stood still, raised her eyes apparently — I saw her lips moving, couldn't hear what she said, made gestures as if in converse with someone above." The witness was not clear as to the time he observed the testatrix so conducting herself on Central avenue.
Reverend James Parker, pastor of the church attended by the testatrix, testified that he had observed the testatrix acting queerly for twenty years prior to her death; that "while she would be in the act of talking to members of her family or to him in her home she would suddenly stop and direct her attention to someone who was invisible and move her lips." The witness further said that the testatrix acted similarly while on the street and that crowds would then gather about her. He further testified that he saw her when *Page 124 
she was violent, without indicating in what respect. She had told the witness that she and her sister, Mrs. Reiser, had planned to leave their property to the church of which the witness was pastor. The witness further testified that during the past twenty years he talked with the testatrix about matters and incidents in which they were interested; and, also, about her spiritual welfare. That in those conversations her talk was connected and intelligent. They had often discussed matters of business and commonplace matters together. He talked with her about her father and mother and how good they were; and he spoke to her about material and spiritual affairs up until May, 1933. The witness said that the testatrix and her sister were old-fashioned German people, parsimonious, frugal and honest and tight, but they gave liberally to his church. The witness further testified that the testatrix told him that she was going to leave her niece the sum of $10,000.
Mathilda MacDonald testified for the appellants. She stated that the testatrix was peculiar and odd and lived poorly. If the testatrix were asked questions she could answer them, but she could not carry on a conversation; that her answers to questions were intelligent. She said the testatrix was an odd person "for the last twenty years." She would raise her hands in the air and apparently converse with "invisible beings."
Emma Black testified that she saw the queer actions of the testatrix, gazing into the heavens and her lips moving; that the testatrix informed her that Ben Freeman was her husband and that Freeman's daughter was her daughter. The witness stated that the testatrix always answered questions.
There was some testimony about the bank books belonging to the testatrix and her deceased sister, Mrs. Reiser, being in Freeman's safe. Mrs. Reiser, it appears, gave her bank books and some other records to Freeman to place in the safe for safe keeping. The testatrix found fault, and quarreled, with Mrs. Reiser for giving the books to Freeman.
There is also testimony by Anna Becker that the testatrix *Page 125 
raised her arms and made motions with her fingers and looked after men; that she talked out of windows and said "God told me." The witness testified that the testatrix was old-fashioned.
Other witnesses testified to the antiquated mannerisms of the testatrix in that she wore clothes that were "out of style and ancient." There was one witness who testified that she had the same hat and coat for a period of thirty years.
Nearly all of the witnesses for the appellants testified to the home conditions of testatrix which were described as being dirty, untidy and miserable. The blinds on her windows were nailed and closed in; the furniture and household utensils in her rooms were in a sad state of repair, disarranged and lying about in a state of disorder and confusion. The testatrix lived in a condition bordering on poverty.
After she was dispossessed by her landlord, Bunker, he helped her obtain apartments from Arthur Scrivani. Bunker testified that he paid part of her first month's rent; and that while the testatrix lived in his premises on Central avenue and Leonard street in Jersey City, that Ben Freeman paid $13 of the $25 monthly rental, and the testatrix paid the balance of $12 a month. Bunker further testified that there were times when the testatrix stood at the window of her apartment cursing and swearing at some one; and he heard her do that on two or three occasions. In the wintertime she had no heat in her apartment, because of which the water pipes froze. Bunker discovered her one day in the winter months, in her bare feet, sweeping from her apartment the water which flowed from a frozen broken pipe. The same witness said that for the one and one-half years when testatrix occupied his apartment, he found her physical appearance to be calm, and she appeared to be rational, but she was "pale looking."
Lightdale, the lawyer who drew the will, said that the testatrix "told me there was nobody she wanted to leave anything to; no relatives, or anybody else, she wanted to leave anything to; that she wanted to leave it all to Mr. Freeman."
Jacob Rek, an attorney-at-law, testified that when the testatrix' *Page 126 
body was removed to an undertaking establishment, Lightdale stated that "Miss Langendorf said to him she had no relatives." Another witness, Arthur Necker, testified that he heard that statement. This testimony was offered to contradict and discredit Lightdale.
Benjamin Gordon in the course of his testimony said that the testatrix "wore queer clothes like the Floradora sextette."
The testimony disclosed there was no frequent communication between the testatrix and her nieces, in fact, there was little, or no, communication between them. The testimony of their visits to the testatrix shows intervals of years elapsing between them, and it appears that there was no evident solicitude, or want of it, exhibited between the testatrix and her relations. The nieces who testified, stated that on several occasions they had called to see the testatrix, but their knocks upon her door were not responded to. There was some testimony that the testatrix was, at the time, in her home and that she watched through the shutters on the windows the endeavors of the visitors to gain admission. There is no testimony that the testatrix either bore, or lacked, affection for her relatives. The testimony of Hillas about the inquiry she made as to the rights her relatives would have in her estate if she died without a will, is somewhat persuasive of her attitude towards her relatives. She seemed to then understand the business she had engaged in. I have given a somewhat extensive outline of the testimony because of the contentions of counsel and their arguments thereon.
The fact that a testatrix indulged in filthy habits, unkempt in appearance (as the testimony indicates the testatrix herein was), careless in her deportment in the presence of company, peevish and stubborn in her manner, garrulous in speech, was not sufficient to establish mental incapacity, in view of a keen interest and alert mind displayed in the preparation of her will and her continued management of her estate for a period of eight years thereafter without intimation of mental incapacity. Ward
v. Harrison, 97 N.J. Eq. 309.
The judge of the orphans court in In re Loh, 3 N.J. Mis. R.1218; 131 Atl. Rep. 213, among other things, said: *Page 127 
"The fact that decedent, at times, acted and spoke peculiarly, may be indicative of mental decay; but they do not establish mental incapacity. [That he at times was peevish and stubborn about his children, questioned their legitimacy and again at times spoke of them with regard and affection did not establish his mental incapacity.] All the attending circumstances must be considered, and, if out of it appears that decedent is capable of recollecting of what his property consists, and who, in consequence of ties of blood or friendship, should be the objects of his bounty, and has a mind sufficiently sound to enable him to know and understand what disposition he wants made of his property after his death, he is deemed competent."
There is no evidence to show that the testatrix, at the time of the execution of the will, was not capable of recollecting of what her property consisted and who, in consequence of ties of blood, or friendship, should be the objects of her bounty, and had a mind sufficiently sound to enable her to know and understand what disposition she wanted made of her property after her death.
In re Hop, 103 N.J. Eq. 11; affirmed, 147 Atl. Rep. 910, the court said:
"It may well be that the testator was not a man of high intellectual attainments, and that he was untidy and rough in his habits; and that his actions were, at times childish, and even eccentric and erratic; but this would not necessarily indicate that, at the time he made his last will and testament, he was so far deficient mentally as to be unable to understand and appreciate the nature of the property he possessed, the natural objects and beneficiaries of his bounty; and the scheme or plan of distribution of his estate, * * *. Not only has the caveatrix, in my judgment, failed to show that the testator was lacking in these respects, but, on the contrary, I feel that the evidence satisfactorily established that he did possess the faculties referred to."
Hillas, called by the appellants, is a very reputable member of the bar of this state; he is an apparently disinterested witness; he told of a conversation which he had with the *Page 128 
testatrix subsequent to the execution of her will at which time she informed the witness of its contents and the reasons for her disposition; that would indicate that no undue influence had been brought to bear to bring about the gifts or bequests which are questioned by the appellants. That testimony, which favorably impressed me, with the testimony of the other witnesses, would lead to the same conclusion.
The court in In re Loh, supra, said:
"He [the testator] was in close and private conference with his physician, his spiritual adviser, two different legal advisers, and numerous friends. If there were undue influence, it was not such as to destroy the free agency of the testator and which amounted to moral and physical coercion."
In the same case the court said:
"The testator's body was undoubtedly racked by his illness, his mind, consequently may have been enfeebled, but his intelligence to exert control over his property and business affairs at no time appears in doubt. The standard of testamentary capacity has been fixed at a very low point in the scale of intelligence. The right of the testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition so long as he has the intelligence to exert it, has been inflexibly maintained by the courts of this state. The caveators were burdened with the obligation of showing that the proponents, or some other person, exercised a control over the mind of the testator, or practiced an importunity which he could not resist. This they have not shown."
The principles thus expressed apply to the instant case.
Chief-Justice Whelpley in Boylan v. Meeker,28 N.J. Law 274, said:
"That the will to others, not having the means of knowing what the testator knows, not occupying his standpoint, not having lived his life, not having his secret affections and hates, may seem unreasonable, injudicious, and even unjust, is no reason why it should be declared the product of a diseased mind. A testator has a right to make an unreasonable, unjust, injudicious will, and his neighbors have no right *Page 129 
sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connections."
I believe the testatrix had a discriminating and disposing mind at the time of the execution of the will; she appreciated the aid, and the attention, whether little or great, the beneficiary rendered, and she so expressed herself. What effect those attentions may have had on other minds, is no standard by which a judgment may be determined in the present case. If they pleased and satisfied the testatrix to the extent of rewarding the donor of them, then nobody else can justly complain. Middleditch v.Williams, 45 N.J. Eq. 726; In re Haness, 98 N.J. Eq. 645; In reYoung, 90 N.J. Eq. 236; In re Halton, 111 N.J. Eq. 143.
The court of errors and appeals in In re Young, supra, said:
"It is as much the duty of the court to uphold the right of the owner of property to dispose of it by will as she pleases, as it is to see that she is not imposed upon in the exercise of that right."
And in In re Halton, supra, it was said:
"This court will not reject a will merely because its provisions appear to the court to be unconscionable, unnatural, or unjust; to do so would be to substitute the court's judgment for that of the testator, whose right it is to dispose of his property as he pleases, unrestricted except by the law of his domicile. * * * It has been repeatedly held in this state that a will may be contrary to the principles of justice and humanity — its provisions may be unjust, nevertheless, if it appears to have been made by a person of sufficient age to be competent to make a will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it."
Did the testatrix possess the mental capacity at the time that the will was executed to know, to appreciate and understand the business in which she was then engaged? It is my opinion that she did. There is no evidence produced in this case to show that she acted to the contrary; and the *Page 130 
burden is upon those who allege incapacity, to prove it. I do not think the appellants have maintained their burden. Loveridge v.Brown, 98 N.J. Eq. 381. The test of mental capacity is whether the subject possessed sufficient mind to understand in a reasonable manner the nature and effect of the act she was engaged in. McCambridge v. Daly, 109 N.J. Eq. 43. Nearly all of the witnesses who testified in the case said that the testatrix could carry on a conversation, speak intelligently, though she acted queerly at times. They all, or most of all them, said her manner of dress was ancient and that her habits were untidy and uncleanly; that her appearance was unkempt. But those evidences do not spell absolute mental or testamentary incapacity.
The principle laid down in Sloan v. Maxwell, 3 N.J. Eq. 563;Lowe v. Williamson, 2 N.J. Eq. 82, is the test of measuring mental capacity that has been followed by the courts in this state for many years. That test has been expressed in language as follows:
"He [the testator] must, in the language of the law, be possessed of a sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatsoever for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able, at all times, to recollect the names, the persons, or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect, to make, and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possible have often thought of; and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. * * * The question is not so much what was the degree of memory possessed by the testator as this — had he a disposing memory? *Page 131 
Was he capable of recollecting the property he was about to bequeath; the manner of distributing it; and the objects of his bounty? To sum up the whole in the most simple and intelligent form — were his mind and memory sufficiently sound to enable him to know, and to understand the business in which he was engaged at the time when he executed his will?" Whitenack v. Stryker,2 N.J. Eq. 8; Boylan v. Meeker, supra.
"The mental capacity requisite to make a will is very low." Inre Halton, 111 N.J. Eq. 143; In re Williams, 95 N.J. Eq. 702;Loveridge v. Brown, supra; In re Hannes, supra; In re Wilson,107 N.J. Eq. 604; affirmed, 110 N.J. Eq. 68; In re Freeman,1 N.J. Mis. R. 642; 127 Atl. Rep. 802.
In my opinion the most that can be said against the conduct of the testatrix is that she was eccentric. Eccentricity, in itself, is not an indication, or evidence, of lack of mental, or lack of testamentary, capacity. In In re Hop, supra, it was held:
"That the testator was not a man of high intellectual attainments, and that he was untidy and rough in his habits; and that his actions were, at times even eccentric and erratic and childish; would not necessarily indicate that he was so far deficient mentally when making the will as to be unable to understand and appreciate nature of property he possessed, natural objects and beneficiaries of his bounty and desired scheme or plan of distribution of estate."
The testimony indicates that the beneficiary and his brother, Oscar, had shown courtesies and kindnesses to the testatrix and her sister, Mrs. Reiser, on many occasions. The testatrix, at different times, expressed her intention of rewarding Ben Freeman. There is no evidence that, on those occasions, she was laboring under a delusion, or that her mental equilibrium was unbalanced, or faulty. She gave to Freeman because of "ties of friendship." In re Loh, supra. The burden of proving undue influence is on the appellants since they allege it. Loveridge
v. Brown, supra.
I do not believe the evidence submitted by the appellants is indicative in the slightest degree of undue influence. *Page 132 
Where in this case is the faintest evidence of it? What word or act is there to support the allegation? I can find none. "The influence which is said by law to be undue and therefore, to vitiate a will, must amount to moral or physical coercion, which destroys the free agency and constrains its subject to do that which, but for it, he would not have done." In re Strang,109 N.J. Eq. 523; In re Bengel, 85 N.J. Eq. 487; affirmed, Idem. 599;In re Freeman, 1 N.J. Mis. R. 642; 2 N.J. Mis. 786; affirmed,97 N.J. Eq. 347; In re Morrissey, Ibid. 480.
The appellants urge that there are many suspicious features about the consideration, preparation and execution of the will of the testatrix. Assuming they are right, there cannot be an adverse decision upon mere suspicion. A testament will be set aside upon the production of convincing evidence of want of testamentary capacity or undue influence as herein observed. But there is nothing definite, or certain, or convincing, in the testimony of the appellants' witnesses as to the time of the "queer" actions of the testatrix. At infrequent periods, with no evidence of continuity, testatrix gave evidence of lip movements, and uplifted eyes and hands, and presumed conversations with "invisible beings" in her home, and, also, on the street, which actions last mentioned, attracted the attention of people who were there present. She indulged in kicking and lifting her feet on the street. These exhibitions were generally, and indefinitely, described. The life of untidiness and apparent miserable living conditions, and her delay, and her failure, in paying the rent of her apartment, and her frugal and her parsimonious attitude generally, in view of the fact that she to her credit over $70,000 in several banks, may be indicative of a weak, or a low standard of intellect in the testatrix; nevertheless, it is not conclusive evidence of lack of testatrix' testamentary capacity at the time of the execution of the will. The testimony of the attesting witnesses, as to what took place at the time of the execution of the will, as well as the testimony of the appellants' witness Hillas, as to testatrix' conduct and conversations prior, and subsequent, to the making of the *Page 133 
testament, with all the other testimony and its attending circumstances, go towards establishing the testamentary capacity, and the competency of the testatrix. In In re Strang, supra, the court of appeals said:
"Facts disclosed that testator was a man seventy-one years of age at the time he made his will, who left surviving him two elderly sisters, with whom he was on friendly terms and that he bequeathed only $100 to one sister, and $300 to another, and the rest of his estate to a man and wife of no blood relationship. While this circumstance may be suspicious, yet we fail to see anything in the testimony which would warrant a finding that the will was the result of undue influence. In the absence of fraud or imposition of undue influence, the court will not speculate as to the probable motives of the testator."
The decree of the orphans court will be affirmed. *Page 134