On March 13th, 1938, Anna C.V.R. Rule, an inmate of the New Jersey State Hospital for Mental Diseases at Greystone Park, Morris Plains, New Jersey, died. In her lifetime, she executed three wills dated respectively, January 24th, 1913, July 19th, 1928 and November 30th, 1934. To the last mentioned will a codicil dated June 13th, 1935, was added. The 1913 and 1928 wills had been offered for probate to the surrogate of Hudson county. The 1934 will and the 1935 codicil were presented to this court. Under the provisions of R.S. 1937, 3:2-20, an order was made by this court, on May 9th, 1938, consolidating the hearing on the several wills and the codicil.
The next of kin of the decedent, at the time of her death, was her brother, Edwin J. Van Reyper, who resided in the borough of Brooklyn, city and State of New York. The decedent had been a resident of Hudson county for the entire period of her life. *Page 256 
At the time of her death, Mrs. Rule was of the age of seventy-five years. She was confined to the state hospital through proceedings instituted in the court of chancery of New Jersey, in August, 1936, by her said brother, to adjudicate her sanity. In those proceedings, an inquisition was held on September 10th, 1936, and she was adjudged a lunatic. The inquisition determined:
"That the said Anna C.V.R. Rule, at the time of taking this inquisition is a lunatic and of unsound mind, so that she is not capable of governing herself, her lands and tenements, goods and chattels, and that she has been in the same state of lunacy for the space of and since November, 1934."
The validity of the will of November 30th, 1934, and the codicil of June 13th, 1935, is questioned. It is alleged that at the time the testatrix executed those instruments, she lacked testamentary capacity.
The first point for determination is: Did the decedent possess the capacity to execute her last will (1934) and codicil (1935)? If the evidence establishes her competency in executing those testaments, then it will not be necessary to give consideration to the questions involved in the formation of the 1928 and 1913 wills. In re Wilson, 107 N.J. Eq. 604; 153 Atl. Rep. 107;affirmed, 110 N.J. Eq. 68; 158 Atl. Rep. 342; Buckman's Case,80 N.J. Eq. 556; 85 Atl. Rep. 246.
The testimony produced by the caveator as to the decedent's mental incapacity may be summarized as follows: Mrs. Rule on occasions would attempt to warm herself beside her fireless furnace; she would attempt to build a fire by using old tin cans as fuel; she would appear to be cooking food without a fire in the stove or furnace; she would accuse people of stealing from her when there was no foundation for the complaint; she would notify the police that people had robbed her when there was no basis for the charge; that from October 3d 1934, to September 24th, 1935, on at least thirty different occasions, she summoned a locksmith to her home for the purpose of changing locks on the door of her apartment, and to furnish her with keys for her locks; that on some of these *Page 257 
occasions, the locksmith found her door unlocked when the decedent declared that it was locked; that she spoke in a rambling manner; that her appearance was untidy and unkempt.
Dr. Collins, a psychiatrist from the state hospital, testified that when he examined the decedent in October of 1936, she was suffering from advanced arterio-sclerosis and cerebral sclerosis. It was his opinion that for a few years prior to 1936 the decedent was mentally incompetent; that she was incapable of managing her affairs; and was unable to understand the nature and quality of her acts. He felt that the decedent's mental incapacity had existed in November, 1934. Dr. Butler, one of the physicians who examined her in the lunacy proceedings, testified to the same effect.
The file in the lunacy proceedings in the court of chancery was submitted and received in evidence. In In re Coleman's Will,88 N.J. Eq. 578; 103 Atl. Rep. 78, the court of errors and appeals held that the findings of the lunacy commission as to the mental state of the testator is prima facie evidence of the facts found, but that it may be overcome by satisfactory evidence of capacity at the time the will was made.
The evidence submitted on behalf of the proponents of the last will and codicil, in brief, is as follows: A short time prior to the execution of the 1934 will, the decedent requested a Mrs. Raymond and her sister, Miss Tate, to accompany her to a bank in the city of New York where she had rented a safe deposit box. Arriving at the institution, the decedent was unable to locate her key to the box. Then, another appointment was made to visit the bank for the purpose of opening the deposit box. That appointment was kept, and the deposit box was opened and contents inventoried. While returning from the bank to the decedent's home in Jersey City, the decedent expressed a desire to have Mr. Dieffenbach, an attorney, prepare her will. At the same time, she stated to her companions that she was hesitant about visiting him because, on a previous occasion, he gave her advice which she failed to follow. She felt that he, consequently, bore her resentment. Mrs. Raymond then volunteered to see him for *Page 258 
her. She succeeded in arranging an interview for the decedent with Mr. Dieffenbach, and, accordingly, the decedent visited his office and consulted him about the preparation of her will. He then instructed her to outline in writing the disposition she wished to make of her estate, and to present the same to him. She did as directed. She prepared a memorandum in her own handwriting (Exhibit P-3) and submitted it to him the following day. It contained the names of her beneficiaries with the bequests to each. Mr. Dieffenbach noticed that it omitted the addresses of the beneficiaries, and he called it to her attention. She then announced the addresses and he wrote them on her memorandum (Exhibit P-3). The memorandum practically embodies the contents of her will. It mentions the name of her brother, Edwin J. Van Reyper, and states why she made no bequest to him. It makes provision for the perpetual care of her cemetery plot, and specific bequests of a number of pieces of jewelry and money. The memorandum is a close approach to a holographic will and appears to be an ordered and well considered document.
Her then counsel was a reputable lawyer of wide and long experience at the bar of this state. He, evidently, carefully tested the decedent's mental qualifications. His examination of her alertness appears to have been thorough. Presumably satisfying himself as to her mental fitness, he proceeded to draw her will. He supervised the execution thereof, and, himself, signed as one of the testamentary witnesses. In the course of his conversation with the decedent, there was mention of interest due on a mortgage covering her property, held by The New Jersey Title Guarantee and Trust Company. The decedent was in doubt as to the date when the interest was to be paid. Upon returning to her home, she found a notice mentioning it from the Title Company. She mailed it to Mr. Dieffenbach, with a letter in her own handwriting (Exhibit P-5).
Her former counsel, now counsel to the caveator, on December 5th, 1934, five days after the execution of her will, wrote her about a proposed sale of some of her real estate. He *Page 259 
suggested that she call at his office with her deeds and other papers relating to it, and, also, to bring with her the keys to her Bramhall avenue house (Exhibit P-6). On December 15th, 1934, the same counsel wrote her about a default in the payment of interest and taxes on her real estate. He requested her to call at his office about the matter (Exhibit P-7).
The codicil was drawn approximately six months after the execution of her last will. The attorney who drew it, Fred W. Dieffenbach, is the son of the lawyer who prepared the decedent's last will. Mr. Dieffenbach, Sr., in the meantime, had died.
Fred W. Dieffenbach testified that after the death of his father, the decedent frequently visited his office and sought his advice upon matters of business. On June 13th, 1935, she told him that she wished to change her will because Emily Budd, one of the beneficiaries therein mentioned, had died. She directed him to cancel the bequest to her, and, also, to cancel the legacy to Evelyn N. Caruso.
A significant feature about the testimony of the caveator's witness, Marguerite Miller, the owner of a restaurant in the decedent's building, is that she testified that the decedent, in her opinion, was incompetent; yet, notwithstanding her impression, she entered into an agreement of lease with the decedent within the period of her alleged incompetency.
Two witnesses, Elsie Steinbach and Evelyn Caruso, subpoenaed by the caveator, were of the opinion that the decedent was of sound mind. Miss Steinbach was employed by the decedent's real estate agent. She testified that she had frequent contacts, many conversations, and considerable business transactions, with the decedent about her real estate. It was her belief that the decedent was fully capable of managing her business affairs.
Evelyn Caruso testified that beginning in 1932, and for about two years thereafter, she had been employed in the decedent's home. She stated that the decedent was mentally competent.
The fact that the decedent was old and possessed many of the infirmities of old age; and had such weaknesses as failing memory, rheumatic or swollen feet, unkempt in appearance, *Page 260 
slovenly as a housekeeper, suspicious of those close to her, may, to some extent, be evidence of deteriorated physical qualities and failing mentality, yet they in themselves do not spell a total mental eclipse. The decisions of the courts make that conclusion clear. Mental capacity to make a will is very low. Inre McComb, 118 N.J. Eq. 119; 177 Atl. Rep. 849; In re Halton,111 N.J. Eq. 143; 161 Atl. Rep. 809; In re Wilson, supra. The courts have ruled, time and again, that testamentary capacity is established if the testator, when making his will, can recall the nature and extent of his property, the natural objects of his bounty, and the nature of the business in which he is engaged.In re McComb, supra; In re Halton, supra; McCambridge v. Daly,109 N.J. Eq. 43; 156 Atl. Rep. 372.
The memorandum drafted by the decedent in her own handwriting outlining her testamentary directions (Exhibit P-3), and her announced reason for making her codicil, in my opinion, are proofs positive of the decedent's intelligence and testamentary capacity. A further evidence thereof is the contract entered into by her on January 16th, 1936, for the sale of her Bramhall avenue property to James Cauldren for the sum of $3,500. Her signature to that contract is witnessed by the caveator's attorney. He took her acknowledgment "that it was her voluntary act and deed for the uses and purposes therein expressed." (Exhibit P-11.) On February 29th, 1936, at the closing of the title to the premises to be conveyed under that contract, the same attorney had the decedent swear to an affidavit of title (Exhibit P-12). On the same day she executed and delivered a deed (Exhibit P-13) as called for by the contract.
On February 25th, 1936, the decedent signed and executed a contract to sell her property, 2836-2838 Hudson Boulevard, Jersey City, to Lexington Jersey Holding Company, by full covenant warranty deed, for the sum of $31,500. The same counsel witnessed her signature to that contract and took her acknowledgment to it (Exhibit P-2). On June 1st, 1936, the title to this property was passed in the office of the New Jersey Title Guarantee and Trust Company. The title officer for that institution took the decedent's affidavit of title in *Page 261 
the presence of counsel for the caveator (who was then acting as counsel for the decedent, Exhibit P-9). On the same day, she executed and delivered a full covenant warranty deed conveying the premises to the Lexington Jersey Holding Company (ExhibitP-10).
While counsel for the proponents of the will and codicil calls attention to the failure of counsel of the caveator to testify to those business transactions of the decedent, he (caveator's counsel) in his brief, justifies his attitude, and replies to the criticism levelled at him, by pointing to the opinion of Chancellor Walker in Garrett v. Garrett, 86 N.J. Eq. 293;98 Atl. Rep. 848, which discusses the impropriety of counsel testifying in proceedings wherein he is engaged as counsel. However, it may be observed that Chancellor Walker in that opinion, also said:
"It is recognized, of course, that there are instances where counsel cannot avoid testifying on behalf of the client, as where facts are so peculiarly within his knowledge that his evidence becomes a matter of necessity in order that justice may be done."
I believe that if counsel for the caveator felt that there was any question about the competency of the decedent to engage in the business transactions hereinabove enumerated, he would not, on these occasions, have permitted her to execute the various instruments which he witnessed; nor would he take her acknowledgments to the documents specified.
I do not question the determination of the lunacy commission as to the decedent's mental incompetence in September, 1936; but, the facts presented in the instant case, demonstrate her competency in making her last will and codicil.
Considering all the evidence and the circumstances, I am satisfied that at the time the decedent executed her last will, in November, 1934, and her codicil, in June, 1935, she was able to recall the nature and extent of her property; the natural objects of her bounty and the nature of the business in which she was then engaged. That being so, then her said will, dated November 30th, 1934, and her said codicil, dated June 13th, 1935, are the products of a competent mind; and both documents are, therefore, valid. *Page 262